Donald H. JOHNSON, et al., Plaintiffs,

v.

Michele K. GUHL, Commissioner of the New Jersey Department of Human Services, et al., Defendants.

No. 99–CIV.–5403 WGB.

United States District Court, D. New Jersey.

April 7, 2000.

756

Donald M. McHugh, McHugh & Macri, East Hanover, NJ, for plaintiffs.

Shirley B. Whitenack, Schenck, Price, Smith & King, LLP, Morristown, NJ, for plaintiffs.

Mary F. Rubinstein, DAG, Attorney General of New Jersey, Trenton, NJ, Meredith Van Pelt, Special Deputy Atty. Gen., Mary F. Rubinstein, for defendants Michele K. Guhl, Commissioner of the New Jersey Department of Human Services, Margaret A. Murray, Director of the New Jersey Division of Medical Assistance and Health Services.

Edwin C. Eastwood, Jr., North Bergen, NJ, for defendant Edward Testa, Director of Bergen County Board of Social Services.

Donald L. Berlin, Berlin, Kaplan, Dembling & Burke, Morristown, NJ, for defendant Elizabeth Lehmann, Director of the Morris County Board of Social Services.

---

**1.** Juanita L. Johnson, William R. Fleming, Dorothy R. Mariani, Phyllis R. Schaible, Marie L. Hicks, Norman V. Silbernagel, Stanley Prystach, Anthony Mackron, Charles V. Banks, Richard C. Weiser, Mary Fillmore.

**2.** On January 19, 2000, this Court has issued a briefing schedule that required Defendants' motion to dismiss and Plaintiffs' motion for preliminary injunction to be completely

*OPINION*

BASSLER, District Judge.

"There can be no doubt but that the statutes and provisions in question, involving the financing of Medicare and Medicaid, are among the most completely impenetrable texts within human experience. Indeed, one approaches them at the level of specificity herein demanded with dread, for not only are they dense reading of the most tortuous kind, but Congress also revisits the area frequently, generously cutting and pruning in the process and making any solid grasp of the matters addressed merely a passing phase." *Rehabilitation Ass'n of Virginia v. Kozlowski,* 42 F.3d 1444 (4th Cir.1994). With this in mind, we begin.

Plaintiffs are married couples with one spouse living in the community ("community spouse") and the other residing in a skilled nursing facility ("institutionalized spouse"). Plaintiffs challenge certain provisions of the New Jersey Medicaid plan governing Medicaid eligibility to cover the cost of the institutionalized spouse's receipt of long term care.

Defendants' motion to dismiss for failure to state a claim upon which relief may be granted is **denied** on all counts, except as to the due process and equal protection claims, and except as to all claims by those Plaintiffs who have not yet applied for Medicaid benefits. Plaintiffs' motion for preliminary injunction is **denied.**

## I. BACKGROUND

Some of the Plaintiffs[1] are institutionalized spouses currently residing in long-term care facilities in New Jersey. (*See* First Amended Compl. ¶ 4.)[2] Of those in-

briefed under Appendix N of the local rules by no later than February 22, 2000. Despite Plaintiffs' knowledge of that Defendants were in the process of briefing their motion to dismiss based on the First Amended Complaint, Plaintiffs filed a Second Amended Complaint on February 15, 2000, without seeking leave of Court because no responsive pleading had technically been filed yet. Be-

stitutionalized spouses, some have been denied Medicaid benefits and have filed fair hearing appeals,[3] and some have Medicaid applications pending.[4] (*Id.* at ¶ 5.) Some Plaintiffs are prospective Medicaid applicants.[5] (*Id.* at ¶ 6.) Plaintiffs residing in the community are the beneficiaries of Community Spouse Annuity Trusts ("CSATs").[6] (*Id.* at ¶ 7.)

In this action, Plaintiffs challenge the treatment of the CSATs as a countable resource in determining Medicaid eligibility. Because the institutionalized spouses have been denied, or will be denied benefits as a result of such treatment, Plaintiffs claim that Defendants' treatment of CSATs constitutes impermissible rule-making in violation of their rights to due process and equal protection. Plaintiffs urge this Court to order the State to implement regulations governing undue hardship hearings.

Plaintiffs are suing Michele Guhl, Commissioner of the New Jersey Department of Human Services ("DHS"), Margaret Murray, Director of the Division of Medical Assistance and Health Services ("DMAHS"), as well as the Directors of the Board of Social Services for Bergen County and Morris County (collectively referred to as "Defendants"). The first amended complaint contains six counts: (1) 42 U.S.C. § 1983; (2) Declaratory Judgment; (3) constitutional due process; (4) improper rule making; (5)equitable estoppel and equal protection; and (6) violation of New Jersey regulations. Plaintiffs seek the following relief:

- to enjoin the fair hearings appeal of Plaintiffs' denials pending resolution of this action;

- declaratory judgment that Defendants engaged in improper rule making;

- a requirement that Defendants utilize proper standards and procedures to adopt regulations to implement undue hardship regulations;

- declaratory judgment that Defendants' denials of each of the institutionalized Plaintiffs pending Medicaid applications were illegal, null and void;

- a requirement that Defendants redetermine each Plaintiff's pending Medicaid application in accordance with current law, regulations and prior "policy" determinations;

- a declaratory judgment that prospective Medicaid applications utilizing CSATs drafted and funded prior to the adoptions of undue hardship regulations be permitted as exceptions to the transfer rules pursuant to 42 U.S.C. § 1396p(c)(2)(B)(i) and (ii);

- estoppel of Defendants from determining that Plaintiffs' contributions of available resources to CSATs constitute transfers for less than fair market value resulting in a period of ineligibility for Medicaid benefits;

- compensatory damages; and

- attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

cause Plaintiffs filed their amended pleading only one week before the reply briefs were complete, the Court will not consider Plaintiffs' Second Amended Complaint despite the fact that technically, no responsive pleading had yet been filed.

3. Juanita L. Johnson, Dorothy R. Mariani, and Mary Fillmore.

4. Phyllis R. Schaible, Charles V. Banks, Marie L. Hicks, Norman V. Silbernagel, Stanley Prystasch, and Anthony Mackron (the parties later stipulated to the dismissal of Bernadine and Richard C. Weiser.)

5. William R. Fleming, Gerald Benedetto, Frances C. Denman, Harold B. Whalon, Jr., Blace LaForge.

6. Donald H. Johnson, Eugene V. Mariani, Mary Lou Fleming, William C. Schaible, Lois Benedetto, Donna R. Banks, Raymond O. Denman, Jr., Charles N. Hicks, Ann B. Silbernagel, Anna Prystasch, Mary Mackron, Janet Whalon, Bernadine Weiser, Grace LaForge, and John Fillmore.

Plaintiffs move for preliminary and permanent injunctive and declaratory relief, and Defendants move to dismiss. Oral argument was held on March 27, 2000.

To understand the issues and place them in context, a brief overview of Medicaid and its eligibility requirements for institutionalized spouses is required.

## II. *MEDICAID*

### A. *Overview*

The Medicaid Act[7] is a cooperative federal-state program that is jointly financed with federal and state funds. *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 501, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). The purpose of the program is to "provide a nationwide program of medical assistance for low income families and individuals." *West Virginia Univ. Hosps., Inc. v. Casey,* 885 F.2d 11, 15 (3d Cir.1989).

> Although participation in the program is voluntary, participating States must comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services (Secretary). To qualify for federal assistance, a State must submit to the Secretary and have approved a "plan for medical assistance," § 1396a(a), that contains a comprehensive statement describing the nature and scope of the State's Medicaid program. 42 C.F.R. § 430.10 (1989).

*Wilder,* 496 U.S. at 501, 110 S.Ct. 2510. The Medicaid program is " 'basically administered by each state within certain broad requirements and guidelines.' " *West Virginia,* 885 F.2d at 15 (citation omitted).

On the federal level, the Secretary of the U.S. Department of Health and Human Services ("HHS") administers the program through the Health Care Financing Administration ("HCFA"). HCFA has issued guidelines, known as "Transmittal 64," or the "State Medicaid Manual," interpreting the transfer of assets and treatment of trusts provisions of the Medicaid Act [hereinafter "HCFA Guidelines" or "Transmittal 64"].[8]

The New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D–1, *et seq.,* authorizes New Jersey's participation in the Medicaid program. On the state level, the DMAHS, an agency contained within the DHS, is responsible for administration of the Medicaid program in New Jersey. N.J.S.A. 30:4D–4. The county welfare agencies ("CWA") assist DMAHS in administering the program by processing applications for Medicaid, including determining whether an applicant has met the income and resource eligibility standards. N.J.S.A. 30:4D–7a; N.J.A.C. 10:71–3.15. CWA staff members make their determinations based on information received from an applicant and from their own investigations to verify, supplement or clarify such information. N.J.A.C. 10:71–1.1 *et seq.*

With certain exceptions, for an individual to be eligible for Medicaid benefits, a person's income and resources must fall below a certain limit. When inventorying an applicant's income and resources to determine eligibility, Medicaid "deems" the income and resources of each spouse to be available to the other when both spouses live together in the community. When, however, one spouse enters a nursing facility ("institutionalized spouse") and is eligible for Medicaid, while the other spouse stays in the community ("community spouse"), the rules become more complex. John Bigler, Diane Archer, John Regan, *An Overview of Social Security, Medicare and Medicaid,* 65 N.Y. State Bar Journal 14 (September/October, 1993) [hereinafter "Bigler Article"]. The Medicare Catastrophic Coverage Act ("MCCA"), enacted

---

**7.** Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.,* was enacted in 1965.

**8.** Attached to Certification of Meredith Van Pelt ("Van Pelt Certif.") and found at www.hcfa.gov/pub-forms/pub45pdf/smmtoc.htm.

in 1988, and the 1993 Omnibus Budget Reconciliation Act ("OBRA") contain provisions addressing this more complex situation.

### B. *Pre–MCCA and OBRA*

Prior to enactment of the MCCA, shortly after a spouse was institutionalized, each spouse was treated as a separate household. Income, such as Social Security checks, pensions, and interest or dividends from investments, were considered to belong to the spouse whose name was on the instrument conveying the funds. Consequently, when the husband, for example, entered a nursing home and the couple's pension check had the husband's name on it, all of that income was attributed to him when determining Medicaid eligibility, leaving the wife destitute. Conversely, if the wife entered the nursing home, the husband had no obligation under federal law to contribute any of that income toward the cost of the wife's care. *See* H.R.Rep. No. 100–105(II), 100th Cong., 2nd Sess., at 66 (1987), *reprinted in* 1988 U.S.C.C.A.N. 857, 889.

A similar rule was in effect for the attribution of resources. *Ibid.* Generally, in the month following institutionalization, jointly held resources to which a spouse had unrestricted access, such as a joint savings account, or resources solely held by the institutionalized spouse, were considered available to that spouse for eligibility purposes. *Ibid.* In contrast, assets solely held by the community spouse were, after the first month, considered to belong to her and she had no obligation under federal law to contribute any amount of such resources toward the costs of care of the institutionalized spouse. *Id.* at 66–67; 1988 U.S.C.C.A.N. at 889–90.

9. The MCCA supersedes any inconsistent provision contained in § 1396. 42 U.S.C. § 1396r–5(a)(1).

10. The CSRA is the greatest of (1) $12,000 (adjusted annually); (2) the lesser of ½ total

### C. *Resource Rules Under MCCA and OBRA*

One of Congress' reasons for enacting the MCCA[9] was to end the "pauperization" of the community spouse "by assuring that the community spouse has a sufficient—but not excessive—amount of income and resources available ... while ... [the institutionalized] spouse is in a nursing home at Medicaid expense." *Id.* at 65, 1988 U.S.C.C.A.N. at 888. Additionally, Congress intended to close the loophole where a couple could shelter resources in the community spouse's name while the institutionalized spouse received Medicaid.

To achieve those goals, the MCCA requires that at the time of institutionalization, a "snapshot" of the total value of the couple's resources owned by either the institutionalized or community spouse is inventoried or assessed. 42 U.S.C. § 1396r–5(c)(1)(A). The spousal share is equal to half of such total value. *Id.* To avoid impoverishment of the community spouse, the community spouse is permitted to retain what is termed the "community spouse resource allowance,"[10] ("CSRA"). 42 U.S.C. § 1396r–5(f)(2).

The CSRA is not considered available to pay for the care of the institutionalized spouse and need not be "spent down" in order for the applicant to be Medicaid eligible.

> If [the community spouse] actually owns less than this amount, a portion of the institutionalized spouse's resources must be transferred to [the community spouse] to raise her personal resources to the required level. Conversely, if her resources exceed this level, she is obliged to spend the excess on the costs of care of the institutionalized spouse. If she refuses, the state has the right to

joint resources or $60,000 (adjusted annually); (3) an amount established pursuant to a fair hearing; or (4) an amount transferred under court order. 42 U.S.C. § 1396r–5(f)(2).

seek to enforce her obligation in the courts, but the institutionalized spouse will still qualify for Medicaid. He, too, after providing for the community spouse's MMMNA, must spend any excess for his own care. Medicaid will pay for his care only after he has spent down to the basic level of exempt resources. Bigler Article; *see* 42 U.S.C. § 1396r–5(c)(2).

To illustrate, if a couple has $100,000 in a joint savings account and jointly held stocks and mutual funds at the time the spouse is institutionalized, then $50,000 is attributable to each spouse. If the ceiling on the community spouse's share of the couple's resources was $48,000, as it was in 1992 when the MCCA was passed, then the $2,000 in excess of $48,000 would be attributed to the institutionalized spouse for the purposes of determining eligibility. Consequently, the couple would have to "spend down" $52,000 (the institutionalized spouse's $50,000 share, plus $2,000 excess resources from the community spouse's share) less the resource eligibility standard (currently $2,000) before the institutionalized spouse could qualify for Medicaid. *See* H.R.Rep. No. 100–105(II), at 77 (1987); 1988 U.S.C.C.A.N. at 900.

### D. *Penalty Period for Transfer of Assets*

When an institutionalized individual who has transferred assets applies for Medicaid benefits, the application is subject to transfer and trust rules under the statutory scheme set forth in OBRA and the MCCA.

In addition to the new resource rules, discussed above, which closed the loophole where a couple could shelter resources in the community spouse's name, the Committee on Energy and Commerce, concerned about the fact that wealthy individuals could transfer resources in order to qualify for Medicaid nursing home coverage, instituted a new formula under the

MCCA for calculating a penalty, (i.e. a period of ineligibility), for transferring of assets. *See* H.R.Rep. No. 100–105(II), at 73; 1988 U.S.C.C.A.N. at 896.

Under OBRA, an institutionalized spouse may be denied Medicaid eligibility if that person (or the person's spouse) has transferred any nonexempt "asset" or his or her home for less than fair market value during the 36 month period (referred to as "look-back" period) before applying for Medicaid while institutionalized. Bigler Article; 42 U.S.C. § 1396p(c)(1)(B)(i). "The term 'asset' includes all of the countable income and resources of the individual or his or her spouse, as well as those assets which these persons are entitled to but do not receive because of their own actions or the action of another person, including a court or administrative body, with legal authority to act in place of the individual or the spouse." Bigler Article; 42 U.S.C. § 1396p(e).

If an asset is transferred during the "look-back" period, then the applicant is subject to a "penalty period," which is a period of ineligibility calculated by dividing the uncompensated amount of the assets transferred by the average monthly cost of nursing home care in the particular state. Michael Feinberg, *Medicaid After OBRA '93 As It Impacts on Long–Term Care Planning,* 164 N.J. Lawyer 24 (October, 1994) [hereinafter "Feinberg article"]. For example, if an individual transfers $300,000 on January 1, 1995 to his respective family members and applies for Medicaid on December 1, 1997, his look-back period extends to December 1, 1994. Because the transfer was made before December 1, 1994, it will fall within the person's look-back period. Because the amount of the transfer was $300,000, an 88 month penalty period ($300,000 divided by $3,376 [11]) would result. Therefore, that in-

---

**11.** $3,376 was the average monthly cost of nursing home care in New Jersey in June

1994. Feinberg Article.

dividual would not be eligible for Medicaid until April 2002.

### E. Treatment of Trusts

Next, specific rules apply for trusts created by the Medicaid applicant, the applicant's spouse, or any person, including a court or administrative body, acting "with legal authority to act in place of or on behalf of the individual or the individual's spouse" or "at the direction or upon the request of the individual or the individual's spouse." [12] The following rules apply regardless of why the trust was established; whether the trustees have or exercise any discretion under the trust; any restriction of when or whether distributions can be made from the trust; or any restrictions on the use of distributions. 42 U.S.C. § 1396p(d)(2)(C).

When a trust is revocable, under the MCCA resource rules, the corpus of the trust is considered a resource to the applicant. 42 U.S.C. § 1396p(d)(3)(A). "Because it remains available, no penalty is incurred for a transfer into a revocable trust." Peter M. Macy, *Medicaid Planning After OBRA–93: Placing the Home in a Revocable Trust*, 79 Mass.L.Rev. 2 (March 1994) [hereinafter "Macy Article"].

The treatment of an irrevocable trust in determining Medicaid eligibility depends on what type of interest the Medicaid applicant retains in the trust. If the applicant is a permitted beneficiary of an irrevocable trust, the corpus of the trust is a countable resource and any distributions to the applicant, whether made from income or principal, will be treated as income to him or her. H.R.Rep. No. 103–111(II), 103th Cong., 1st Sess., at 207–08 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 534–35; 42 U.S.C. § 1396p(d)(3)(B)(i). "Any other payments from the trust are considered a transfer of assets by the individual." *Ibid.*

If, on the other hand, the applicant can in no way benefit from the trust, no part of

the corpus will be treated as a countable resource to the institutionalized spouse. *See* HCFA Guidelines § 3259.6(C); *see also* Feinberg Article. Rather, the corpus of the trust will be considered a transfer of assets for less than fair market value and trigger a 60–month look-back period. 42 U.S.C. § 1396p(d)(3)(B)(ii); 42 U.S.C. § 1396p(c)(1)(B)(i). Certain transfers, however, such as the transfer of assets between spouses "for the sole benefit of" the other spouse, do not trigger a penalty period. 42 U.S.C. § 1396p(c)(2)(B)(i). HCFA has established that a "sole benefit" transfer is one where "no individual or entity except the spouse ... can benefit from the assets transferred in any way, whether at the time of the transfer or at any time in the future." HCFA Guidelines § 3257(b)(6). A trust meets this definition if the trust provides for "spending of the funds involved for the benefit of the individual a basis that is actuarially sound based on the life expectancy of the individual involved." *Ibid.*

Exhibit A attached to the Certification of Eugene Mariani ("Mariani Cert.") is typical in form and content of the CSATs at issue here. *See* Certification of Donald McHugh, Esq. ("McHugh Cert."), ¶ 2. The CSATs are irrevocable trusts created for the "sole benefit" of the community spouse. The purpose of the trust is to qualify the institutionalized spouse for Medicaid benefits. According to the trust document, the trust is "actuarially sound" within the meaning of OBRA and the HCFA Guidelines because the entire income and corpus will be issued to the community spouse within his/her lifetime, as determined by the actuarial tables set forth in the HCFA Guidelines. Defendants do not dispute that the CSATs at issue are actuarially sound transfers "for the sole benefit of" the community spouse and are therefore not subject to a transfer penalty. As required by DMAHS, upon the death of the beneficiary (community spouse), the trust names DMAHS as the

---

12. 42 U.S.C. § 1396p(d)(2)(A).

first beneficiary under the CSAT. The CSAT terminates when the first of the following occurs: the corpus is exhausted; the beneficiary dies; or the actuarial life expectancy expires.

### F.  *Undue Hardship Provisions*

Pursuant to the Medicaid Act, the transfer rules do not render an applicant ineligible to the extent that "the State determines, under procedures established by the State (in accordance with standards specified by the Secretary), that the denial of eligibility would work an undue hardship as determined on the basis of criteria established by the Secretary." 42 U.S.C. § 1396p(c)(2)(D).

### G.  *New Jersey Medicaid*

Defendants do not dispute that since late 1994 (when trusts had to comply with OBRA), DMAHS had approved the use of numerous CSATs so that the community spouse trust amounts were excluded from the countable resources of the institutionalized spouse.  On April 16, 1998, however, a letter was issued by Robert Streimer, on behalf of HCFA, to a private attorney in Virginia ("Streimer letter") explaining that assets in a trust established solely for the benefit of the community spouse were to be viewed in two contexts: (1) whether the transfer of assets for less than fair market value subjects the institutionalized spouse to a transfer penalty; and (2) whether the asset is a countable resource.  *See* McHugh Certif., Ex. D.

While the letter is certainly not binding on this Court, it is, at the very least, instructive.  In the Streimer letter, the HCFA agreed that no transfer penalty was triggered by the transferral between spouses of assets for less than fair market value.  The letter provided that actuarial soundness was one means of determining that a transfer was in fact made for the sole benefit of the spouse.  It disagreed, however, that actuarial soundness had any bearing on whether the trust was a counta-

ble resource.  According to HCFA, the "sole benefit of" trust did not warrant the same treatment as a standard annuity because it was an irrevocable trust subject to § 1917(d) of the Social Security Act;[13] the Streimer letter explained that there is a fundamental difference between a standard annuity and the "annuitized" trust at issue.

> A standard annuity requires the actual purchase of a commodity, i.e., the annuity itself. . . . Upon completion of the transaction, the buyer no longer owns the funds used to purchase the annuity. Instead, he or she owns the annuity itself.  If the annuity is irrevocable, as most annuities are, the buyer cannot reclaim ownership of the funds used to purchase the annuity.

Streimer Letter.  By contrast, the corpus of the trust established for the sole benefit of the community spouse can, at some point in time, be paid to the community spouse.  *Id.* Therefore, the author of the Streimer letter concluded that while the spouse was not subject to the transfer penalty provision, the corpus of the trust at issue was a countable resource.

After learning of HCFA's position, DMAHS, by letter dated July 6, 1999, notified the Bergen County Board of Social Services that "actuarial soundness only pertains to whether a penalty can be imposed for transferring assets to a third party for the sole benefit of a spouse" and "does not affect how resources are counted in determining eligibility."  *See* McHugh Certif., Ex. A. Echoing the Streimer letter, the letter from DMAHS further explained that because CSATs can be paid at some point in time to the community spouse, the entire corpus is considered available to the community spouse.  In recognition that some applications for Medicaid eligibility had been submitted in reliance on the prior approvals of CSATs and that some applications had been pending for awhile, DMAHS offered to permit the community

---

**13.** § 1917(d) of the Social Security Act is co-   dified at 42 U.S.C. § 1396p(d).

spouse to convert the CSAT into a commercially purchased annuity, naming the state as the first remaining beneficiary. *See* Mariani Certif., Ex. C.

## III. *DISCUSSION*

### A. *Motion to Strike*

#### 1. *McHugh Certification*

At oral argument, Defendants made an oral motion to strike the Certification of Donald M. McHugh, Esq., alleging that it contains legal conclusions.

Local Civil Rule 7.2 provides that "[a]ffidavits shall be restricted to statements of fact within the personal knowledge of the affiant. Argument of the facts and the law shall not be contained in the affidavits. Legal arguments and summations in affidavits will be disregarded by the Court . . ."

■ To the extent that the McHugh Certification does contain legal conclusion, those portions will be ignored. Only matters within Mr. McHugh's personal knowledge shall be considered by this Court. *See San Filippo v. Bongiovanni*, 743 F.Supp. 327, 332 n. 3 (D.N.J.1990) (striking inadmissible elements of affidavit but permitting remainder), *rev'd on other grounds*, 961 F.2d 1125 (3d Cir.), *cert. denied* 506 U.S. 908, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992); *see also Lombardi v. Cosgrove*, 7 F.Supp.2d 481, 492 (D.N.J. 1997) (denying motion to strike but ignoring conclusions, beliefs, and misstatements, and using the assertions based on personal knowledge).

#### 2. *Overlength Brief*

■ Local Rule 7.2(b) requires that permission to file an over length brief must be obtained from the Court "prior to submission of the brief." In violation of Local Rule 7.2(b), Plaintiffs submitted a Reply Brief to Defendants' Brief in Opposition that exceeded the 15 page limit. Although Plaintiffs sought leave of Court to file an over length reply brief in the already over length brief itself, they did not seek leave *prior* to filing the over length brief as required by common sense and by the express terms of Local Rule 7.2(b). While in this instance, the Court will still consider the excess pages of Plaintiffs' reply brief, Plaintiffs are reminded that in the future, they are to abide by the court rules.

### B. *Defendants' Motion to Dismiss*

#### 1. *Standard Governing Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for a dismissal based upon the pleader's "failure to state a claim upon which relief can be granted." Since the long-established federal policy of civil litigation is to decide cases on the proofs, district courts generally disfavor Rule 12(b)(6) motions. *Melo–Sonics Corp. v. Cropp*, 342 F.2d 856 (3d Cir.1965); *Panek v. Bogucz*, 718 F.Supp. 1228, 1229 (D.N.J.1989).

In deciding a motion to dismiss for failure to state a claim, all allegations in the pleadings must be accepted as true and the plaintiff must be given the benefit of every favorable inference that can be drawn from those allegations. *See Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 83 n. 1 (3d Cir.1987); *Markowitz*, 906 F.2d at 103. "All the rules require is a short and plain statement of the claim that gives the defendant fair notice of the plaintiff's claim and the grounds upon which it rests." *Conley*, 355 U.S. at 47, 78 S.Ct. 99.

Rule 12(b)(6) does not countenance "dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Accepting the facts in the pleadings as true and giving them all reasonable inferences, a court must dismiss under Rule 12(b)(6) "[i]f as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Neitzke,* 490 U.S. at 326–27, 109 S.Ct. 1827.

### 2. Federal Question

█ Plaintiffs allege that this Court's jurisdiction is based on 28 U.S.C. § 1331 [14] because their claims "arise under" federal law, namely the Medicaid provisions of the Social Security Act and the Due Process clause. Nevertheless, Defendants argue that Plaintiffs' complaint presents no federal question.

For purposes of "arising under" jurisdiction,

[a]n action arises under the laws of the United States if and only if the complaint seeks a remedy expressly granted by a federal law or if it requires the construction of a federal statute or a distinctive policy of a federal statute requires application of federal legal principles for its disposition.

*Lindy v. Lynn,* 501 F.2d 1367, 1369 (3d Cir.1974). Here, to determine whether the remedies sought by Plaintiffs are warranted, the Court must apply or interpret provisions of the Medicaid Act.

Plaintiffs allege that the provisions and application of the New Jersey State Medicaid plan conflict with the Federal Medicaid plan provisions as set forth in § 1396p. For example, Plaintiffs contend that contrary to § 1396p(c)(2)(D), the State has not provided for an "undue hardship" hearing for those who have been denied Medicaid benefits. Because Plaintiffs specifically assert that state law conflicts with federal law, the case relied on by Defendants, *Concourse Rehabilitation & Nursing Center Inc. v. DeBuono,* 179 F.3d 38 (2nd Cir.1999) (holding that absent assertion of

a specific conflict between the State Medicaid plan and federal law, there is no federal jurisdiction over a § 1983 claim that a State has violated provisions of its own Medicaid plan), is inapplicable. Therefore, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

### 3. Standing/Ripeness

Defendants suggest that some of the Plaintiffs, namely those that have not applied for Medicaid benefits, lack standing to bring this action. Without engaging in that determination, the Court concludes that this matter is not ripe with respect to those Plaintiffs who have not yet applied for Medicaid benefits. For ease of reference, "Plaintiffs," for this subsection only, will refer to those who have not yet applied for Medicaid benefits.

█ All federal actions, including those for declaratory or injunctive relief, must involve a "case and controversy." *Philadelphia Federation of Teachers v. Ridge,* 150 F.3d 319, 322–23 (3d Cir.1998). Ripeness is one aspect of justiciability, which "'determines when a proper party may bring an action.'" *Id.* at 323 (citing *Travelers Ins. Co. v. Obusek,* 72 F.3d 1148, 1154 (3d Cir.1995)). Unless the record affirmatively shows otherwise, or plaintiffs meet their burden to clearly allege facts invoking a federal court's jurisdiction, the presumption is that jurisdiction is lacking. *Ibid.* The ripeness doctrine serves to prevent federal courts "from entangling themselves in abstract disagreements." *Ibid.* (citing *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)).

Ultimately, the case must involve "'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of

---

**14.** 28 U.S.C. § 1331 provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

facts.'" [citations omitted]. "A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action ...'" [citations omitted]. *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1463 (3d Cir.1994).

■ When determining whether a request for declaratory judgment is ripe, a court should examine two factors: (1) "'the fitness of the issues for judicial decision,' and (2) 'the hardship to the parties of withholding court consideration.'" *Philadelphia Federation of Teachers,* 150 F.3d at 323 (citing *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507).

Under the first criterion,

> various factors that enter into a court's assessment of fitness include: whether the claim involves uncertain and contingent events that may not occur as anticipated or at all; the extent to which a claim is bound up in the facts; and whether the parties to the action are sufficiently adverse. [citations omitted].

*Ibid.*

■ Here, whether Plaintiffs will be irreparably harmed by Defendants' alleged wrongful conduct in determining Medicaid eligibility is contingent on numerous uncertain and contingent events including whether Plaintiffs do actually ever apply for Medicaid, whether Plaintiffs' establish a CSAT, and how many other resources Plaintiffs have. Although Plaintiffs may anticipate applying for Medicaid benefits in New Jersey, they may be unable to do so as a result of unexpected events, for example, death or moving out of New Jersey. Moreover, if and when Plaintiffs apply, there may be other unanticipated events that render this Court's decision inapplicable, such as: a change in federal or state law; a change in interpretation of federal law by the federal or state agencies administering Medicaid; or divorce, which would render the MCCA inapplicable. Fi-

nally, by the time Plaintiffs apply, Defendants may have implemented regulations governing undue hardship hearings and may, as a result, be eligible for benefits under that exception.

Additionally, there is not sufficient adversity of interests between the parties; any threat to Plaintiffs of being negatively impacted by Defendants' policies is not "real and immediate." To determine whether there is adversity of interest, which is indicative of an actual controversy, the parties must have "adverse legal interests." *Presbytery,* 40 F.3d at 1463. Although Plaintiffs need not have suffered a "'completed harm' to establish adversity of interest," there must be a "substantial threat of real harm" and the "threat 'must remain real and immediate throughout the course of the litigation.'" *Ibid.* (citations omitted).

Plaintiffs do not identify a presently existing harm or threat, but rather, the threat of a threat. That is, Plaintiffs claim that even if they purchase commercial annuities in accordance with Defendants' current policy, they face the "real threat that DMAHS will again change its policy," which they conclude, is an "unacceptable" alternative to them. Should DMAHS again change its policy, Plaintiffs argue that they would then suffer the same irreparable harm that the other Plaintiffs face, namely eviction of the institutionalized spouse from the nursing home.

While the non-applicant Plaintiffs characterize their alternative to purchase a commercial annuity as "speculative," their allegations of injury based on an assumption or chance that Defendants will again change their policy is even more speculative. The Court will not render an opinion based on hypothetical facts. *See North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (noting that ripeness doctrine requires "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion

advising what the law would be upon a hypothetical state of facts.")

Therefore, whether the prospective Medicaid applicants are entitled to injunctive relief involve issues that are not fit for judicial decision under the first part of the test.

> The second factor
>
> focuses on the hardship that may be entailed in denying judicial review, and the determination whether any such hardship is cognizable turns on whether the challenged action creates a "direct and immediate" dilemma for the parties, such that the lack of pre-enforcement review will put the plaintiffs to costly choices. [citations omitted].

*Ibid.* Plaintiffs cannot claim that they will suffer hardship as a result of this Court's denial of judicial review of their claims. Should the Plaintiffs whose applications have been denied or are pending prevail in obtaining an injunction against Defendants, the non-applicant Plaintiffs will not be harmed. If, alternatively, the other Plaintiffs do not prevail, then the non-applicant Plaintiffs have the opportunity to do what is necessary to become eligible for Medicaid. Therefore, this action is dismissed as to those prospective Medicaid applicants.

### 4. *Section 1983*

█ 42 U.S.C. § 1983 "imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws'" of the United States. *Blessing v. Freestone,* 520 U.S. 329, 341, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). Section 1983 provides a cause of action for violations of the Constitution as well as federal statutes. *Wilder,* 496 U.S. at 508, 110 S.Ct. 2510 (citing *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980)). There are, however, two exceptions. A plaintiff may sue under § 1983 unless (1) the federal statute does not create enforceable rights, privileges, or immunities within the meaning of § 1983; or (2)

Congress, in the statute itself, has foreclosed enforcement of the statute under § 1983. *Ibid.*

In *Wilder,* 496 U.S. at 520–23, 110 S.Ct. 2510, the Supreme Court rejected an argument that "Congress has foreclosed enforcement of the Medicaid Act under § 1983." *See Harris v. James,* 127 F.3d 993, 997 n. 4 (11th Cir.1997).

To determine whether a federal statute creates an enforceable right under § 1983, the court must consider three factors:

> First, Congress must have intended that the provision in question benefit the plaintiff. [citation omitted]. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. [citation omitted]. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

*Blessing,* 520 U.S. at 340–41, 117 S.Ct. 1353.

#### a. *Cause of Action Under § 1983*

█ Here, Plaintiffs claim a cause of action under several provisions of the Medicaid Act. One such provision that Plaintiffs allege creates an enforceable right is 42 U.S.C. § 1396p(c)(2)(D), which provides:

> (c) **Taking into account certain transfers of assets** ... (2) An individual shall not be ineligible for medical assistance by reason of paragraph (1) to the extent that—... (D) the State determines, under procedures established by the State (in accordance with standards specified by the Secretary), that the denial of eligibility would work an undue hardship as determined on the basis of criteria established by the Secretary; ...

According to Plaintiffs, under that provision, Plaintiffs were entitled to, but were not provided with an "undue hardship"

hearing. Although Defendants claim that the State does offer every applicant an opportunity to apply for an undue hardship exception, for purposes of a motion to dismiss, Plaintiffs' allegations must be accepted as true.

A plain reading of this provision evidences that it is intended to benefit needy individuals for whom denial of Medicaid eligibility would work an undue hardship. *Compare Rodriguez v. DeBuono*, 44 F.Supp.2d 601, 611 (S.D.N.Y.), *rev'd on other grounds*, 197 F.3d 611 (2nd Cir.1999) (noting that § 1396(a)(10)(B), which provides that a "State plan ... provide ... that the medical assistance made available to any individual ... not be less in amount, duration, or scope than the medical assistance made available to any other such individual ...," is intended to benefit categorically needy persons) *with Harris*, 127 F.3d at 1010 (concluding that § 1396a(a)(19), which requires State plans provide " 'such safeguards as may be necessary to assure that ... care and services will be provided ... in a manner consistent with simplicity of administration and the best interests of the recipients,' " only imposed a generalized duty on the States without conferring any particular right upon the plaintiffs). Because Plaintiffs claim that they would have benefitted from an "undue hardship" hearing, the first element is met.

The second criterion, whether the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence, is also satisfied. The Medicaid Act, 42 U.S.C. § 1396p(c)(2)(D), requires that the State's procedures to determine whether the denial of eligibility would work an undue hardship must be in accordance with standards specified by the Secretary. The Secretary administers the Medicaid program through HCFA. Section 3259.8(A) of the HCFA Guidelines provides that: "Undue hardship exists when application of the trust provisions would deprive the individual of medical care such that his/her health

or his/her life would be endangered" or "when application of the trust provisions would deprive the individual of food, clothing, shelter, or other necessities of life."

According to section 3259.8(C) of the guidelines, the state has "considerable flexibility in deciding the circumstances under which [the state] will not count funds in trusts under the trust provisions because of undue hardship." Under the undue hardship provision, however, the state must, at a minimum, provide for "[n]otice to recipients that an undue hardship exception exists; [a] timely process for determining whether an undue hardship waiver will be granted; [a] process under which an adverse determination can be appealed." Section 3259.8(C).

Because the HCFA Guidelines outline how undue hardship is to be measured, enforcement of a defined standard would not "strain judicial competence." *See Wilder*, 496 U.S. at 519–20, 110 S.Ct. 2510 (rejecting argument that because Boren Amendment gives a state flexibility to adopt any rates it finds reasonable and adequate, Amendment is too "vague and amorphous" to be judicially enforceable).

Finally, the third factor is also satisfied. The use of the word "shall" in § 1396p(c)(2)(D) makes the "undue hardship" exception mandatory rather than precatory. "The language succinctly sets forth a congressional command, which is wholly uncharacteristic of a mere suggestion or 'nudge.' " *West Virginia University Hospitals, Inc. v. Casey*, 885 F.2d 11, 20 (3d Cir.1989) (citing *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 19, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (holding that cause of action for violation of § 1396a(a)(13)(A) of Medicaid Act arises under § 1983 in part because language of that provision is cast in the imperative)), *aff'd*, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991); *see also Rodriguez*, 44 F.Supp.2d at 611 (concluding that cause of action arises under § 1983 for violation of § 1396a(a)(10)(B) of Medicaid Act in part because that provision uses

mandatory, rather than precatory language); *but see Harris,* 127 F.3d at 1011 (finding that federal regulation read in conjunction with § 1396a(a)(10)(B), while it may create some federal right, does not give rise to a federal right to transportation enforceable under § 1983).

Although Plaintiffs also allege violations of subsections of § 1396a and § 1396p, they have not addressed whether those provisions give rise to enforceable rights by satisfying the three factor analysis laid out by the Supreme Court in *Blessing.*

▬ Nevertheless, just as § 1396p(c)(2)(D) provides for a cause of action under § 1983, Plaintiffs are correct that § 1396a(a)(18) also creates a federal right enforceable under § 1983. That provision mandates that "[a] State plan for medical assistance must—... comply with the provisions of section 1396p of this title with respect to ... transfers of assets, and treatment of certain trusts...." First, the specific purpose of this section is to assure state compliance with some federal standard of accounting for trusts and transfers of assets to determine eligibility. This benefits those who would be eligible for benefits under § 1396p. Because Plaintiffs contend that they would benefit from the State's compliance with § 1396p, they are part of the intended beneficiaries. Second, § 1396a(a)(18) does not strain judicial competence for a court to review whether, and in what manner, certain assets were taken into account when determining an individual's eligibility for benefits. Third, the language of this section contains mandatory rather than precatory terms.

b. *Definition of "Person" under § 1983*

Defendants argue that they cannot be sued under § 1983 because neither a state nor a state agency is a "person" under § 1983. Section 1983 states in part:

Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

(emphasis added).

The Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *see also Powell v. Ridge,* 189 F.3d 387, 401 (3d Cir.) (holding that when state officials are sued for damages in their official capacities, "the suit is treated as one against the state and the official is not considered to be a 'person' thereby precluding reliance on § 1983") (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 and n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)), *cert. denied,* —— U.S. ——, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999). As explained in *Will,*

Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. *Brandon v. Holt,* 469 U.S. 464, 471, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985). As such, it is no different from a suit against the State itself. See, e.g., *Kentucky v. Graham,* 473 U.S. 159, 165–166, 105 S.Ct. 3099, 3104–3105, 87 L.Ed.2d 114 (1985); *Monell* [ *v. Dept. of Social Services of City of New York* ], supra, [436 U.S. 658] at 690, n. 55, 98 S.Ct., [2018] at 2035, n. 55[ 56 L.Ed.2d 611 (1978)]. We see no reason to adopt a different rule in the present context, particularly when such a rule would allow petitioner to circumvent congressional intent by a mere pleading device.

*Will,* 491 U.S. at 71, 109 S.Ct. 2304.

In a footnote, however, the Supreme Court cautioned that:

Of course a state official in his or her official capacity, when sued for *injunc-*

*tive relief,* would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." Kentucky v. Graham, 473 U.S., at 167, n. 14, 105 S.Ct., at 3106, n. 14; *Ex parte Young,* 209 U.S. 123, 159–160, 28 S.Ct. 441, 453–454, 52 L.Ed. 714 (1908).

*Id.* at 71, n. 10, 109 S.Ct. 2304 (emphasis added).

■■■ Therefore, although Plaintiffs' claim against Defendants for monetary damages must be dismissed, to the extent that Plaintiffs seek injunctive and declaratory relief, those claims withstand Defendants' motion to dismiss. Plaintiffs may also maintain their claim for attorneys' fees. *Cf. Missouri v. Jenkins,* 491 U.S. 274, 279, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (noting that Eleventh Amendment does not bar an award of attorney's fees ancillary to prospective relief); *Meredith v. Federal Mine Safety and Health Review Commission,* 177 F.3d 1042, 1049 (C.A.D.C.1999) ("where attorney's fees are provided for by statute, as here, qualified immunity has no application.")

5. *Eleventh Amendment Immunity*

Defendants claim that a suit against the New Jersey Department of Human Services, Division of Medical Assistance and Health Services, Michele K. Guhl, Commissioner of the New Jersey Department of Human Services, and Margaret A. Murray, Director of DMAHS is barred by the Eleventh Amendment.[15]

■■ Defendants are correct that absent consent by a state, suits for money damages against a state or state officials in their official capacities are barred by the Eleventh Amendment. *See Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (concluding that Eleventh Amendment barred official capacity action for damages in § 1983 suit);

*Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (holding that suit against state official for retroactive monetary relief, which requires payment of funds from state treasury is barred by Eleventh Amendment).

■■ The Amendment, however, does not bar Plaintiffs from suing state officials for violations of federal law where future injunctive relief is sought. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (holding that Eleventh Amendment does not prohibit suit to enjoin state Attorney General from enforcing state statute that allegedly violated Fourteenth Amendment); *see also Edelman,* 415 U.S. 651, 94 S.Ct. 1347. The theory of *Ex parte Young* is not without its limits. As explained in *Edelman,* under *Ex parte Young,* the Eleventh Amendment may bar equitable relief if it in practice is a money judgment payable out of the state treasury. *Edelman,* 415 U.S. at 666–67, 94 S.Ct. 1347. In *Edelman,* the district court had ordered the state to retroactively release and remit benefits wrongfully withheld. The Supreme Court reversed that decision concluding that such an order was "in practical effect indistinguishable in many aspects from an award of damages against the State." *Id.* at 668, 94 S.Ct. 1347. In so holding, the Court distinguished those cases in which injunctive or declaratory relief was not barred because such relief was likely to have only an "ancillary effect on the state treasury" such as in *Ex parte Young. Ibid.* In *Ex parte Young,* "the state law which the Attorney General was enjoined from enforcing provided substantial monetary penalties against railroads which did not conform to its provisions." *Id.* at 667, 94 S.Ct. 1347.

■■ Here, granting Plaintiffs prospective injunctive relief would likely require the State to spend more money from the

---

**15.** The Eleventh Amendment to the United States Constitution provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of a Foreign State."

state treasury than if it were left to continue its current course of conduct. Such an effect would, however, be ancillary and is therefore not barred by the Eleventh Amendment under *Ex parte Young* and *Edelman.*

■ Therefore, Defendants' motion to dismiss is denied to the extent that Plaintiffs seek prospective injunctive relief and attorneys' fees. *See Missouri,* 491 U.S. at 279, 109 S.Ct. 2463 ("it must be accepted as settled that an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment"). Plaintiffs' claims for compensatory damages against Defendants are, however, barred by the Eleventh Amendment.

### 6. *Due Process Claim*

■ To establish a claim for violation of constitutional procedural due process, a plaintiff must (1) show that a protected property interest was taken; and (2) that the procedural safeguards surrounding the deprivation were inadequate. *See Board of Regents v. Roth,* 408 U.S. 564, 568–69, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Plaintiffs contend that they are entitled to proper notice regarding a change in policy that would deprive them of Medicaid benefits or "property" because they would have qualified for Medicaid absent the State's informal change of its policy regarding CSATs as a countable resource.

■ First, it is clearly established that once an individual is a recipient of direct Medicaid benefits, such benefits are a protected property interest that cannot be

16. 42 C.F.R. § 431.211 provides in pertinent part: "The State or local agency must mail a notice at least 10 days before the date of action, . . . ."

17. 42 C.F.R. § 435.919 states in relevant part: "(a) The agency must give recipients timely and adequate notice of proposed action to terminate, discontinue, or suspend their eligibility or to reduce or discontinue services they may receive under Medicaid."

18. 42 C.F.R. § 447.205 provides:

withdrawn without giving the recipient notice and an opportunity to be heard. *See O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 787, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980); *see also Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

■ Although Plaintiffs have never been granted Medicaid benefits, nevertheless, without citing any supporting law, Plaintiffs contend that they have a protected property interest in Medicaid benefits. The Court disagrees. Plaintiffs are not entitled to any procedural safeguards with respect to a property interest for which they have never been deemed qualified. *See Goldberg,* 397 U.S. at 262, 90 S.Ct. 1011 (noting welfare benefits "are a matter of statutory entitlement for persons qualified to receive them"); *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has *already* acquired in specific benefits." (emphasis added)); *see also Oberlander v. Perales,* 740 F.2d 116, 120 (2nd Cir.1984) (recognizing that "Medicaid providers clearly have no property interest in *future* reimbursements under New York law." (emphasis added)).

■ Even assuming Plaintiffs had a protected property interest, Plaintiffs claim that they were deprived of their right to due process in violation of the prior notice requirements set forth in 42 C.F.R. §§ 431.211,[16] 435.919,[17] and 447.205, is untenable.[18] *See* First Amended Compl.

(a) *When notice is required.* Except as specified in paragraph (b) of this section, the agency must provide public notice of any significant proposed change in its methods and standards for setting payment rates for services.
(b) *When notice is not required.* Notice is not required if—
(1) The change is being made to conform to Medicare methods or levels of reimbursement;
(2) The change is required by court order; or

¶ 56. 42 C.F.R. § 431.211 provides that notice must be mailed at least 10 days before the date of "action." "Action" is defined in § 431.201 as "termination, suspension, or reduction of Medicaid eligibility or covered services." Because Plaintiffs have not yet been deemed Medicaid eligible, their eligibility, by definition, cannot be terminated, suspended, or reduced. Consequently, § 431.211 does not apply to Plaintiffs. Moreover, in 42 C.F.R. § 431.200, *et seq.*, which governs "Fair Hearings for Applicants and Recipients," § 431.206 [19] only gives Plaintiffs the right to notice of their right to a fair hearing; it does not give Plaintiffs the right to notice of a change in interpretation of the Medicaid Act.

Furthermore, § 435.919 requires fair hearings for Medicaid beneficiaries who have their benefits reduced, suspended, or terminated. Because Plaintiffs are merely Medicaid applicants who have been denied benefits, potential Medicaid applicants, or individuals whose applications are pending, rather than Medicaid recipients, Plaintiffs are not entitled to the rights afforded persons already receiving benefits. Moreover, 42 C.F.R. § 447.205 requires public notice when there is a proposed change in the methods and standards for setting payment rates. Therefore, that regulation does not affect applicants or potential applicants such as Plaintiffs; such notice would only affect Medicaid providers.

Additionally, Plaintiffs argue in their motion for preliminary injunction, that Defendants' "policy change" of viewing CSATs as a countable resource constitutes impermissible rule making that fails to comply with N.J.S.A. 52:14B–1, *et seq.* and that its retroactive application violates Plaintiffs' due process rights to prior notice and appeal.

■ Allegations that Defendants violated state law and their own procedures in denying adequate notice and opportunity to be heard do not provide the basis for a constitutional due process claim. *See Concourse Rehabilitation & Nursing Center Inc. v. DeBuono,* 179 F.3d 38, 44 (2nd Cir.1999); *see also Hartwick v. Board of Trustees of Johnson County Community College,* 782 F.Supp. 1507, 1511 (D.Kan. 1992).

Therefore, Plaintiffs' due process claims are dismissed.

### 7. Equal Protection

■ While neither party has briefed this issue, the allegation in Plaintiffs' complaint that Defendants' conduct somehow violated their constitutional rights to equal protection fails as a matter of law.

---

(3) The change is based on changes in wholesalers' or manufacturer' prices of drugs or materials, if the agency's reimbursement system is based on material cost plus a professional fee.

(c) *Content of notice....*

(d) *Publication of notice.* The notice must—

(1) Be published before the proposed effective date of the change; and

(2) Appear as a public announcement in one of the following publications:

(i) A State register similar to the FEDERAL REGISTER.

(ii) The newspaper of widest circulation in each city with a population of 50,000 or more.

(iii) The newspaper of widest circulation in the State, if there is no city with a population of 50,000 or more.

**19.** Section 431.206 provides in pertinent part:

(b) The agency must, at the time specified in paragraph (c) of this subsection, inform every applicant or recipient in writing—(1) Of his right to a hearing; (2) Of the method by which he may obtain a hearing; and (3) That he may represent himself or use legal counsel, a relative, a friend, or other spokesman.

(c) The agency must provide the information required in paragraph (b) of this section—(1) at the time that an individual applies for Medicaid; (2) At the time of any action affecting his or her claim; (3) At the time a skilled nursing facility or a nursing facility notifies a resident in accordance with § 483.12 of this chapter that he or she is to be transferred or discharged; and (4) At the time an individual receives an adverse determination by the State with regard to the preadmission screening and annual resident review requirements ...

The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." This provision creates no substantive rights. Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly. *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (" '[T]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same' ") (quoting *Tigner v. Texas,* 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940)). If a legislative classification or distinction "neither burdens a fundamental right nor targets a suspect class, we will uphold [it] so long as it bears a rational relation to some legitimate end." *Romer v. Evans,* 517 U.S. 620, —— [631], 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996).

*Vacco v. Quill,* 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997) (citations omitted).

Here, Plaintiffs have not been identified as a suspect class and no fundamental rights are involved. To the extent that Defendants' conduct or "policy change" does not treat all applicants who have used CSATs alike, it can be argued that such treatment bears a rational relation to the legitimate end of complying with the federal Medicaid Act and Congress' intent to provide medical assistance to the needy. Plaintiffs' equal protection claim is therefore dismissed.

### 8. *Exhaustion of State Remedies*

Defendants assert that Plaintiffs' remedy for the State's denial of Medicaid eligibility is to seek redress through the State courts. If eligibility is denied, an applicant may appeal an agency's decision by obtaining a fair hearing. N.J.S.A. 30:4D–7(e); N.J.A.C. 10:49–10.3(b). If appropriate, the appeal is heard by an Administrative Law Judge ("ALJ"). The Director of DMAHS then reviews the initial decision of the ALJ and issues a final agency decision, which is appealable to the Appellate Division. *See* New Jersey Court Rules Governing Appellate Practice, R. 2:2–3(a)(2) (all final state administrative agency decisions are appealable as of right); and Administrative Procedures Act, N.J.S.A. 52:14B–12.

■ Notwithstanding those state appeals procedures, "[t]he availability of state administrative procedures ordinarily does not foreclose resort to section 1983." *Wilder,* 496 U.S. at 524, 110 S.Ct. 2510. Additionally, as argued by Plaintiffs at the March 27, 2000 hearing, they are seeking to enforce the federal mandate that States provide applicants an opportunity to have an undue hardship hearing,[20] which is separate and distinct from a fair hearing. *See* Transcript of March 27, 2000 Hearing ("Hearing Tr."), 37:1–14.

### C. *Plaintiff's Motion for Preliminary Injunction*

■ The issuance or denial of a preliminary injunction is a matter committed to the sound discretion of the trial court. *Penn Galvanizing Co. v. Lukens Steel Co.,* 468 F.2d 1021, 1023 (3d Cir. 1972). An injunction, however, is "an extraordinary remedy which should be granted only in limited circumstances." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989).

■ In ruling on a motion for a preliminary injunction, the court must be convinced that all four of the following factors favor preliminary relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer "irreparable harm" without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest. *Clean Ocean Action v. York,* 57 F.3d 328, 331 (3d Cir.

---

**20.** Defendants concede that the State does not currently have regulations implemented setting forth procedures, such as the administrative remedies, for an undue hardship hearing.

1995); *American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1426 (3d Cir.1994).

Plaintiffs allege that the New Jersey Medicaid plan does not comport with the federal Medicaid Act in the following respects:

(a) Failure to provide notice of and establish procedures for "undue hardship" hearing pursuant to 42 U.S.C. § 1396p(c)(2)(D) to provide a "final" level of appeal in the event of denial of Medicaid benefits based on financial eligibility for elderly institutionalized spouses;

(b) Application of financial standards for eligibility and transfer of asset rules that do not conform to 42 U.S.C. § 1396p and, in violation of N.J.S.A. 30:4D–3(i)(15)(b),[21] are more restrictive in scope, duration, or amount of services than permitted;

(c) Establishing, without basis in federal or state law, a "more restrictive" condition by requiring that New Jersey be the first named beneficiary upon the death of the community spouse to the extent of full reimbursement for Medicaid benefits paid on behalf of the institutionalized spouse; and

(d) Enunciating the "new policy" to reject CSATs in violation of N.J.S.A. 52:14B–1, *et seq.* and to apply that change retroactively in violation of 42 C.F.R. §§ 431.211, 435.919, 447.205, rights to constitutional due process and equal protection.

Each contention will be addressed in turn.

**1. *Undue Hardship Hearing***

**a. *Likelihood of Success on the Merits***

■■■ The requirement that the State Medicaid plan include a procedure to determine whether an "undue hardship" exception applies is set forth in 42 U.S.C. § 1396p(c)(2)(D).[22] It is evident from the legislative history that it is mandatory that the states provide for an undue hardship exception. Congress, specifically concerned that the states were not extending to all individuals facing hardship the protections of existing law, crafted OBRA to specifically amend existing law to require "the Secretary (1) to specify standards that State hardship determination procedures must meet, and (2) to establish criteria States must apply in determining whether a hardship exists." H.R.Rep. No. 103–111(II), 103th Cong., 1st Sess., at 207 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 534.

Sections 3259.8(A) and (C) of the HCFA Guidelines provide that at a minimum, the undue hardship provision must provide for: (1) notice to a recipient that an undue hardship exists; (2) a timely process for determining whether an undue hardship waiver will be granted; and (3) a process under which an adverse determination can be appealed.

Plaintiffs contend that contrary to the mandates of 42 U.S.C. § 1396p(c)(2)(D) and the HCFA Guidelines, neither the

**21.** That provision provides in pertinent part:

An individual who has, within 36 months, or within 60 months in the case of funds transferred into a trust, of applying to be a qualified applicant for Medicaid services in a nursing facility ..., disposed of resources or income for less than fair market value shall be ineligible for assistance for nursing facility services ... The period of ineligibility shall be the number of months resulting from dividing the uncompensated value of the transferred resources or income by the average monthly private payment rate for nursing facility services in the State as determined annually by the commissioner.

In the case of multiple resource or income transfers, the resulting penalty periods shall be imposed sequentially. Application of this requirement shall be governed by 42 U.S.C. § 1396p(c). In accordance with federal law, this provision is effective for all transfers of resources or income made on or after August 11, 1993. Notwithstanding the provisions of this subsection to the contrary, the State eligibility requirements concerning resource or income transfers shall not be more restrictive than those enacted pursuant to 42 U.S.C. § 1396p(c).

**22.** *See supra* III.B.4.a., for text of 42 U.S.C. § 1396p(c)(2)(D).

Medical Assistance Act in N.J.S.A. 30:4D–1 *et seq.* nor the numerous regulations implementing the State Medicaid provisions have defined or enacted hardship provisions to allow the over age 65, institutionalized Plaintiffs to appeal denial of their Medicaid applications. Moreover, they argue that under OBRA, 42 U.S.C. § 1395a(e)(3), all participating Medicaid states were to adopt all regulations enacting OBRA within one year of its effective date. According to Plaintiffs, even after six years, the State has failed to enact, as it was required to do, regulatory procedures to implement undue hardship exceptions in the State Medicaid plan pursuant to New Jersey's Administrative Procedure Act ("APA"), N.J.S.A. 52:14B–1, *et seq.*

Defendants do not contest that Plaintiffs must be permitted to apply for an undue hardship hearing and that provisions for a hearing on the hardship issue have not been codified in the New Jersey Administrative Code; rather, they assert that Plaintiffs were offered an undue hardship hearing, but have refused to pursue that option. Moreover, counsel for Defendants represented to the Court at the March 27th hearing, that the Commissioner of DMAHS will file with the New Jersey Office of Administrative Law proposed regulations establishing undue hardship hearings before the end of April, 2000. Hearing Tr. 13:17–16:17. Then the proposal would, in accordance with the procedures set forth in the state APA governing rule making, be published in the New Jersey Register for notice and comment. *Ibid.*

Nevertheless, Defendants have not, as they are required to do, instituted any regulations providing for: (1) notice to applicants that an undue hardship exception exists; (2) a timely process for determining whether an undue hardship waiver will be granted; and (3) a process under which an adverse determination can be appealed, Plaintiffs are likely to prevail on this issue.

b. *Irreparable Harm*

In this Circuit, "to show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. Economic loss does not constitute irreparable harm." *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir.1994). Thus, in order to warrant a preliminary injunction, the injury created by a failure to issue the requested injunction "must be of a peculiar nature, so that compensation in money cannot atone for it." *A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515, 525 (3d Cir.1976) (citation omitted) (internal quotation marks omitted). Moreover, "[a]n inability to precisely measure financial harm does not make that harm irreparable or immeasurable." *Acierno,* 40 F.3d at 655.

Additionally, the injury alleged must not only be irreparable, it must be imminent as well. *Holiday Inns of Am., Inc. v. B & B Corp.,* 409 F.2d 614, 618 (3d Cir.1969) (noting that injunctive relief "may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights.")

Defendants have represented that the procedures for establishing state regulations governing the undue hardship exception would be initiated no later than the end of April, 2000. Therefore, there is no threat of immediate irreparable injury resulting from the current absence of regulations. Furthermore, it is worth noting that even if this Court were to order Defendants to promulgate such regulations, Defendants must still follow the procedural requirements set forth in the APA to promulgate such regulations. Consequently, these regulations would not be instituted any faster than with an order from this Court.

As to these particular Plaintiffs who have not had the benefit of such regulations, Defendants have expressed a willingness to provide that hearing; moreover, despite the fact that there are not yet any state adopted standards and procedures,

section 3259.8 of the HCFA Guidelines at least provides a definition of "undue hardship" and a framework for the state standards. Therefore, Plaintiffs are, at the minimum, protected by those federal standards.

Because Plaintiffs are not subject to immediate irreparable harm, this factor weighs against granting preliminary relief.[23] Therefore, the Court need not engage in an analysis of the remaining factors to determine whether granting a preliminary injunction is appropriate.

■ Alternatively, even if the Court were to conclude that there was the potential of immediate irreparable harm, the Court would not exercise its discretion to grant the extraordinary relief sought by Plaintiffs. Before seeking a preliminary injunction compelling Defendants to implement regulations, Plaintiffs, although not required to have done so before filing a § 1983 action, could have resorted to N.J.S.A. 52:14B–4(f), which authorizes and sets forth the procedures for an interested person to petition an agency to promulgate, amend or repeal any rule. Once such a petition is received by the agency, the agency must respond within 30 days. Plaintiffs suggest that they have not filed a petition with the DMAHS because this administrative procedure "typically results in delays of one year or more" and because DMAHS has continually been advising the Elder Law Section of the New Jersey Bar Association that proposed regulations required under OBRA, now five years over-

due, will be forthcoming "shortly." If Plaintiffs truly believed that irreparable injury would result from Defendants' failure to have implemented official regulations governing undue hardship hearing, the remedy available to Plaintiffs under N.J.S.A. 52:14B–4(f) was available during the six years since the enactment of OBRA.

Therefore, Plaintiff's motion for preliminary injunctive relief on this issue will be **denied without prejudice.** In the event, however, that Defendants do not initiate the process of implementing regulations governing the undue hardship exception by the end of April 2000, or Defendants do not provide these specific Plaintiffs the opportunity to have an undue hardship in accordance with the standards set forth in the HCFA Guidelines, Plaintiffs may seek the appropriate relief from this Court.

### 2. *Application of Transfer Rules and Treatment of Trusts*

Here, because the CSATs are irrevocable trusts that can, in no way, benefit the applicant, Plaintiffs argue that CSATs qualify as exceptions to the transfer rules set forth in 42 U.S.C. § 1396p(c)(2)(B)(i) and (ii), and N.J.A.C. 10:71–4.7(e)(1)(i).[24] Defendants do not contest that of the Plaintiffs who have actually submitted trusts for review, all the trusts were deemed to be actuarially sound transfers for the sole benefit of the community spouse and not subject to a transfer penalty.[25] Defs.' Br. in Opp. to Mot. for Prelim-

---

**23.** Plaintiffs argue that the nursing facilities will be harmed because of the financial impact of them of not getting paid. The Court will not consider that argument because the nursing facilities are not parties to this action and Plaintiffs do not have standing to argue on behalf of those facilities.

**24.** N.J.A.C. 10:71–4.7(e)(1)(i) states:
If funds were transferred to another individual for the sole benefit of the community spouse prior to entry into institutional care, in order that the transfer not be considered to have been for the purposes of qualifying for Medicaid, the funds must have been transferred in the form of a legally binding

trust document specifying that the trustee(s) may use the funds solely for the benefit of the community spouse. Should the transferred funds not be so designated, the transfer shall be presumed to be for the purpose of qualifying for Medicaid in accordance with the provisions of this section;

**25.** This renders moot Plaintiffs request that the Court estop Defendants from determining that Plaintiffs' contribution of available resources to CSATs constitute transfers for less than fair market value resulting in a period of ineligibility for Medicaid benefits.

inary, Permanent Injunction and Declarative Relief, at 23. In other words, in this circumstance, the corpus of the trust is considered a transfer of assets for less than fair market value, which would normally trigger a look-back period, but in this case, does not because the transfer was for the "sole benefit of" the community spouse. Therefore, no part of the corpus of the CSAT would be treated as a countable resource to the institutionalized spouse. *See* Feinberg article.

Although the "sole benefit of" trust does not trigger a penalty period and is not a countable resource to the grantor or institutionalized spouse, § 1396p(d)(3)(B)(ii) [26] does not expressly address whether an irrevocable trust, from which the institutionalized spouse may not benefit, and created solely for the benefit of the community spouse, is a countable resource to the community spouse in calculating the spousal share and CSRA and determining Medicaid eligibility.

Plaintiffs insist that because the CSATs are actuarially sound, as defined in HCFA Guideline § 3258.9B, and are "for the sole benefit of" the spouse, as defined in HCFA Guideline § 3257.B6, the CSATs are also not countable resources for Medicaid eligibility purposes. As argued by Defendants, however, actuarial soundness is a factor in determining whether a transfer to a third party was in fact made for the sole benefit of the spouse. *See* HCFA Guideline § 3257.B6; Streimer letter. If a transfer was made for the sole benefit of the

spouse, then that determination impacts whether the transfer for less than fair market value triggers a transfer penalty and has no bearing on whether an asset is a countable resource.[27]

Next, Plaintiffs conclude that the CSAT is analogous to a commercial annuity because the CSAT annuitized payout of principal and earnings meet the HCFA Guidelines for annuities set forth in § 3258.9B.[28] HCFA Guideline 3258.9B, however, applies to annuities. Moreover, Plaintiffs' own words belie their contention: "[s]ection 3259 of HCFA 64 defines 'annuities' and specifies that Section 3258.9B controls how annuities are to be evaluated and treated. Therefore, the 'plain meaning' is that *Section 3259 trust provisions are inapplicable to annuity trusts* since Section 3258.9B controls." Pls.' Reply Br. in Support of Mot. For Preliminary Injunction, at 9 (emphasis added).

In asserting that "sole benefit of" trusts are in fact countable resources, Defendants emphasize that such trusts are not included in 42 U.S.C. § 1382b among the list of resources that are excludable. Indeed, § 3260.1 of the HCFA Guidelines defines "countable resources" are "resources [that are] not subject to exclusion."

In further support of their position, Defendants rely on the informal statement of HCFA's views set forth in the Streimer letter that "sole benefit of" trusts are countable resources. *See supra* discussion II.G. As explained in that letter, an irrevo-

---

**26.** 42 U.S.C. § 1396p(d)(3)(B)(ii) states:

any portion of the trust from which, or any income on the corpus from which, no payment could under any circumstances be made to the individual shall be considered, as of the date of establishment of the trust (or, if later, the date on which payment to the individual was foreclosed) to be assets disposed by the individual for purposes of subsection (c) of this section, and the value of the trust shall be determined for purposes of such subsection by including the amount of any payments made from such portion of the trust after such date.

**27.** Although Defendants as well as Plaintiffs both look to different paragraphs of § 3258.11 of the HCFA Guidelines to support their respective positions, that section is inapplicable because it merely addresses when certain transfers of assets for less than fair market value are exempt from penalty, rather than when resources are countable in determining eligibility.

**28.** Section 3258.9B provides in part that if an annuity is not actuarially sound, then the annuity is considered a transfer of assets for less than fair market value subjecting the individual to a penalty.

cable trust is unlike a commercial annuity because in an irrevocable trust, the corpus can be paid at some point to the community spouse, but in a standard annuity, the buyer is only entitled to the income stream purchased and cannot reclaim the funds used to purchase the annuity.

Plaintiffs respond that the Streimer letter is merely a response to a private attorney on a specific set of facts unknown to DMAHS, rather than a rule, regulation, or guideline that has ever been subjected to judicial review to determine compliance with federal law.

■ Contrary to Plaintiffs' contentions, HCFA's Guidelines and the Streimer letter, although not formal regulations, are entitled to some deference by this Court as long as "they are consistent with the plain language and purposes of the statute and if they are consistent with prior administrative views." *Cleary v. Waldman*, 167 F.3d 801, 808 (3d Cir.) (granting deference to HCFA and HHS clearly stated views, albeit in policy letters, that states have discretion to employ either income-first or resource-first method to determine Medicaid eligibility), *cert. denied*, —— U.S. ——, 120 S.Ct. 170, 145 L.Ed.2d 144 (1999); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) (stating that where an administrative agency's interpretation is registered in informal views, as long as that agency has a delegated authority to administer the statute and the views are made "in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge," then those views warrant some deference); *Elizabeth Blackwell Health Center for Women v. Knoll*, 61 F.3d 170 (3d Cir.1995) (noting that interpretive rules by an agency with lawmaking authority will receive deference even if the agency's interpretation is not made pursuant to that lawmaking authority), *cert. denied*, 516 U.S. 1093, 116 S.Ct. 816, 133 L.Ed.2d 760 (1996).

■ In examining HCFA's interpretation of the treatment of irrevocable trusts, such as the CSATs at issue here, the Court determines that the agency's view is based on a permissible construction of the statute. As stated earlier in this opinion, the MCCA, discussed *supra* n. 9, supersedes any inconsistent provisions in that subchapter; therefore, to the extent that Plaintiffs argue that 42 U.S.C. § 1396p(c)(2) is inconsistent with the MCCA, the MCCA controls. 42 U.S.C. § 1396r–5(a)(1). The MCCA provides that when computing spousal share at the time of institutionalization, a "snapshot" of all of the couple's countable resources, which includes "the total value of the resources to the extent *either* the institutionalized spouse or the community spouse has an ownership interest," is taken. 42 U.S.C. § 1396r–5(c)(1). Under the plain meaning of this section, a CSAT is a resource to the community spouse, and therefore, is part of the total value of resources in determining spousal share. As discussed earlier in this opinion, if the community spouse's share exceeds the "community spouse resource allowance," then any excess must be spent down for the care of the institutionalized spouse. *See* 42 U.S.C. § 1396r–5(c)(2)(B) ("resources shall be considered to be available to an institutionalized spouse, but only to the extent that the amount of such resources exceeds" the CSRA).

Moreover, HCFA's position does not frustrate Congress' intent in enacting the MCCA to enable the community spouse to live above the poverty level. Instead, it ensures that Medicaid, as it was intended, helps the truly needy and furthers the legislature's intent to "require couples to bear a reasonable amount of the costs of institutionalized care and thus preserve Medicaid resources." *Cleary v. Waldman*, 959 F.Supp. 222, 232 (D.N.J.1997), *aff'd* 167 F.3d 801, 807 (3d Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 170, 145 L.Ed.2d 144 (1999).

It is noteworthy that ten of the Plaintiffs who have submitted trusts for review have countable resources in excess of the maximum amount that federal law permits the community spouse to retain:

| Denman | $833,000 |
| Fillmore | $492,000 |
| Johnson | $288,000 |
| Mariani | $272,000 |
| Mackron | $250,000 |
| Fleming | $236,000 |
| Banks | $193,000 |
| Hicks | $168,000 |
| Schaible | $ 58,000 |
| Silbernagle | $ 53,000 |
| Prystasch | $ 15,000 |

See Certification of Elena Josephick, ¶ 7.

Finally, HCFA's Guidelines were issued after OBRA was enacted in 1993. Plaintiffs do not contend that the Guidelines are inconsistent with HCFA's prior administrative view. Additionally, the Streimer is consistent with the interpretation set forth in the Guidelines.

Therefore, because Defendants' policy of including the CSATs as a countable resource is based on HCFA's position, which is consistent with federal law, Plaintiffs are not likely to prevail on this issue. Accordingly, the Court need not determine the remaining factors to determine if injunctive relief on this issue is warranted.

### 3. New Jersey as First Named Beneficiary

#### a. Likelihood of Success on the Merits

According to Plaintiffs, prior to July 1999, the CSATs in the format utilized by Plaintiffs were routinely approved upon compliance with conditions imposed by DMAHS. Such conditions included a requirement that DMAHS be named as the first beneficiary of the CSAT upon the death of the community spouse to recover Medicaid assistance paid on behalf of the institutionalized spouse. Plaintiffs claim that this requirement was imposed notwithstanding that the estate recovery provisions mandated in 42 U.S.C. § 1396p(c)

and codified in N.J.S.A. 30:4D–7.2 limit estate recovery to actions against the estate of the institutionalized spouse, not the community spouse.

42 U.S.C. § 1396p(b)(1) provides that after the death of the community spouse, states must "seek adjustment or recovery of any medical assistance correctly paid on behalf of an individual under the State plan" from the recipient's estates [29] or "upon sale of the property subject to a lien imposed on account of medical assistance paid on behalf of the individual." Similarly, N.J.S.A. 30:4D–7.2 also provides for the State's recovery from the estate of a deceased recipient for assistance correctly paid or to be paid on his behalf. As argued by Plaintiffs, the federal and state estate recovery provisions do not authorize recovery actions against the community spouse's estate.

Defendants do not address this argument and in effect, concede their error. At oral argument, defense counsel explained that DMAHS required it to be first named beneficiary because at that time, Defendants erroneously believed that the "sole benefit of" trust was an excludable resource. Hearing Tr. 74:22–75:7.

Because Plaintiffs' position is correct that this condition is "more restrictive" than permitted by federal law, Plaintiffs are likely to succeed on this issue.

#### b. Irreparable Harm to Plaintiffs

Plaintiffs, however, will not suffer any immediate irreparable harm. First, Defendants have explained that they required DMAHS to be the first named beneficiary because they had considered the "sole benefit of" trust to be an excludable resource. Because Defendants are now treating such trusts as includable, logic dictates that Defendants will no longer require DMAHS to be the first named beneficiary. Therefore, there is no potential of immediate irrepa-

---

**29.** The term "estate" includes all real and personal property included within the individ-

ual's estate under state probate law. 42 U.S.C. § 1396(b)(4).

rable harm to Plaintiffs. Plaintiffs' motion for preliminary injunction on this issue is **denied without prejudice.** In the event, however, that Defendants fail to eliminate this requirement, Plaintiffs may seek the appropriate relief.

## IV. *CONCLUSION*

For the foregoing reasons, Defendants' motion to dismiss for failure to state a claim upon which relief with respect to the due process and equal protection claims, and as to all claims by Plaintiffs who are only prospective Medicaid applicants is **granted,** and Defendants' motion as to the balance is **denied.** Because Plaintiffs cannot establish immediate irreparable injury, Plaintiffs' motion for preliminary injunction is **denied.**