# United States Court of Appeals
## For the First Circuit

No. 18-1223

MAINE POOLED DISABILITY TRUST;

Plaintiff, Appellant,

YVONNE R. RICHARDSON, by her Conservator Barbara Carlin,

Plaintiff,

v.

RICKER HAMILTON, in his official capacity as Commissioner of
Maine Department of Health and Human Services,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Thompson, Kayatta, and Barron,
Circuit Judges.

Ron M. Landsman, with whom Landsman Law Group, Rene H.
Reixach, Jr., Woods, Oviatt, Gilman, LLP, Richard L. O'Meara, and
Murray, Plumb & Murray were on brief, for appellant.
Thaddeus A. Heuer, with whom Dean Richlin, Jeremy W.
Meisinger, and Foley Hoag, LLP were on brief, for National Academy
of Elder Law Attorneys and Guardian Community Trust, amicus curiae.
David Scott Hamilton and Dennis M. Sandoval, APLC on brief
for Special Needs Alliance, amicus curiae.
Christopher C. Taub, Assistant Attorney General of Maine,
with whom Janet T. Mills, Attorney General of Maine, and Susan P.

Herman, Deputy Attorney General of Maine, were on brief, for appellee.

Joseph H. Hunt, Assistant Attorney General, Halsey B. Frank, U.S. Attorney, Alisa B. Klein, Attorney, Civil Division, Appellate Staff, Casen B. Ross, Attorney, Civil Division, Appellate Staff, Robert P. Charrow, General Counsel, U.S. Department of Health and Human Services, Janice L. Hoffman, Associate General Counsel, U.S. Department of Health and Human Services, Susan Maxson Lyons, Deputy Associate General Counsel for Litigation, U.S. Department of Health and Human Services, David L Hoskins, Attorney, U.S. Department of Health and Human Services, W. Charles Bailey, Jr., Attorney, U.S. Department of Health and Human Services, on brief for the United States of America, amicus curiae.

June 20, 2019

**KAYATTA**, **Circuit Judge**.  This case concerns transfers of assets by individuals age sixty-five or older into what are called "pooled special needs trusts."  The issue posed is whether such transfers are among those transfers that the Medicaid statute counts against eligibility for long-term care benefits.  The district court held that they are.  For the following reasons, we agree.

## I.

The pertinent facts are straightforward and materially undisputed.

Yvonne R. Richardson is an elderly resident of St. Joseph's Manor nursing facility in Portland, Maine.  At the time of the complaint, Richardson was eighty-seven years old and receiving Medicaid benefits to help pay for the cost of her long-term care.  See generally 42 U.S.C. § 1396p(c)(1)(C)(i)(I) (listing covered long-term care benefits, including nursing facility services).  In January 2017, Richardson's conservator, Barbara Carlin, deposited $38,500 of the proceeds from the sale of Richardson's former home into an account with Maine Pooled Disability Trust ("MPDT"), a pooled special needs trust established pursuant to 42 U.S.C. § 1396p(d)(4)(C).

Pooled special needs trusts allow disabled individuals with relatively small amounts of money to pool their resources for investment and management purposes.  Lewis v. Alexander, 685 F.3d

325, 333 (3d Cir. 2012).  They are designed to "provide for expenses that assistance programs such as Medicaid do not cover." Id. (quoting Sullivan v. County of Suffolk, 174 F.3d 282, 284 (2d Cir. 1999)).  Richardson hoped to use her MPDT funds to pay for "modest expenditures" not covered by Medicaid "that would greatly improve her quality of life," such as large-print word-search and crossword puzzle books, new clothing, sweets, manicures, magazines, and a radio.  She also intended to hire a private caregiver who could take her on excursions outside the nursing facility.

Following Richardson's deposit of funds into her MPDT account, the Maine Department of Health and Human Services ("MDHHS") issued a notice threatening to suspend Medicaid coverage for her care at St. Joseph's Manor for "3.53 months" because "[a]ssets were transferred" and she "did not get something of equal value" in exchange.  See 42 U.S.C. § 1396p(c)(1)(A) (penalizing an institutionalized individual's "dispos[al] of assets for less than fair market value").  In response, Richardson requested an administrative hearing.  She and MPDT also filed this lawsuit in federal court challenging MDHHS's decision to suspend her Medicaid coverage.  The hearing officer subsequently stayed state administrative proceedings pending resolution of the lawsuit. Richardson will continue to receive Medicaid benefits until the administrative review of MDHHS's decision is complete.

Richardson and MPDT's complaint included two counts, but only the second is at issue here.[1]  That count asserts a claim under 42 U.S.C. § 1983, seeking a declaration and injunction predicated on the assertion that Richardson's transfer of assets into a pooled special needs trust is not a transfer that affects Medicaid eligibility.  The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6).  Richardson, 2018 WL 1077275, at *18.

In so doing, the district court ruled that Richardson had standing to challenge the decision to suspend her Medicaid coverage, but her claim was not yet ripe because "[a]ny penalty (and related adverse impact on [Richardson's] benefits) ha[d] been stayed pending her administrative appeal," such that her claims "lack[ed] sufficient finality and definiteness" for judicial review.  Id. at *4-5.  The district court determined that MPDT had associational standing and that MPDT's contention that MDHHS's ruling was currently causing MPDT to lose both enrollees and funds rendered its claim ripe for adjudication.  Finally, the district

---

[1] The district court dismissed Count I, which alleged that Richardson and "others similarly situated" in fact "receive fair market value from the expenditures the [MPDT] can make on their behalf" and therefore should incur no transfer penalty, because it was premised on two provisions of the Medicaid statute that the court found to be unenforceable under 42 U.S.C. § 1983. Richardson ex rel. Carlin v. Hamilton, No. 2:17-CV-00134-JAW, 2018 WL 1077275, at *1, 13 (D. Me. Feb. 27, 2018).  On appeal, MPDT does not contest that ruling.

- 5 -

court ruled that MDHHS correctly applied the governing statute in considering transfers to pooled special needs trusts in determining eligibility.

MPDT alone filed a timely notice of appeal. No party disputes that MPDT has standing or that its claim is ripe. Nor do we see any reason to question either standing or ripeness sua sponte. As the district court observed, because "(1) one of MPDT's members, [Richardson], has standing to [sue]; (2) the interests at stake . . . are germane to MPDT's purpose; and (3) the relief requested does not require the participation of other MPDT beneficiaries in this litigation," id. at *9, MPDT has standing to bring its claims on behalf of its beneficiaries. See Council of Ins. Agents & Brokers v. Juarbe-Jiménez, 443 F.3d 103, 108 (1st Cir. 2006). And as to ripeness, no one cites any reason to doubt that, as the district court found, MDHHS's ruling currently harms MPDT. We therefore proceed to the merits of the order granting MDHHS's motion to dismiss Count II, which we review "de novo, applying the same criteria as the district court." Germanowski v. Harris, 854 F.3d 68, 71 (1st Cir. 2017) (quoting Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 717 (1st Cir. 2014)).

## II.

Medicaid is a "health insurance program for low-income individuals . . . funded by both the federal government and state governments." Massachusetts v. Sebelius, 638 F.3d 24, 26 (1st

Cir. 2011) (citing 42 U.S.C. § 1396 et seq.). Medicaid is supposed to be a "payer of last resort," id. (quoting Ark. Dep't of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 291 (2006)), and Medicaid eligibility criteria generally take an applicant's income and wealth into account, see Lewis, 685 F.3d at 332.

Under Medicaid's prior asset-counting rules, inventive "lawyers and financial planners . . . devised various ways to 'shield' wealthier [applicants'] assets," including by placing assets in trusts. Johnson v. Guhl, 357 F.3d 403, 405 (3d Cir. 2004). So, Congress amended the Medicaid scheme, aiming, as a general matter, to treat trusts as assets available to beneficiaries, thus counting against Medicaid eligibility. Lewis, 685 F.3d at 333; see also Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312 (1993) ("OBRA").

Although state participation in Medicaid is voluntary, participating states must adopt plans that meet certain requirements that federal statutes and regulations impose. See Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. 1378, 1382 (2015). Failure to comply may jeopardize federal funds. See 42 U.S.C. § 1396a(a). Among these requirements, states must "comply with the provisions of section 1396p . . . with respect to . . . transfers of assets . . . and [the] treatment of certain trusts." 42 U.S.C. § 1396a(a)(18). This case turns on the

relationship between two particular provisions of section 1396p: The Trust Provision and the Transfer Provision.

**A.**

The Trust Provision, section 1396p(d), sets forth several general rules addressing the treatment of assets held in trust (the trust corpus) and the treatment of payments out of trusts. Assets in revocable trusts are considered resources available to the applicant for purposes of determining his or her entitlement to benefits. Id. § 1396p(d)(1), (3)(A)(i). Payments from such trusts are considered either income of the applicant or assets disposed of by the applicant under the Transfer Provision. Id. § 1396p(d)(3)(A)(ii), (iii). Assets in irrevocable trusts are also considered available resources to the extent that payments could be made from such trusts for the applicant's benefit. Id. § 1396p(d)(3)(B)(i). And payments from these trusts are likewise considered either income or transferred assets. Id. § 1396p(d)(3)(B)(i)(I), (II). Further, portions of irrevocable trusts from which no payment could be made to the applicant are considered transferred assets, and the value of the trust for purposes of the Transfer Provision is determined by including the amount of any payments made from such portion of the trust. Id. § 1396p(d)(3)(B)(ii).

These rules governing the treatment of trust corpuses and payments out of trusts do not apply universally. The 1993 OBRA

amendments exempted three types of trusts for disabled individuals -- special needs trusts, Medicaid income trusts, and pooled special needs trusts -- from the eligibility rules set out in the Trust Provision. See id. § 1396p(d)(4)(A), (B), (C). This case concerns pooled special needs trusts.

A pooled special needs trust "contain[s] the assets of an individual who is disabled (as defined in [42 U.S.C. § 1382c(a)(3)])." Id. § 1396p(d)(4)(C). To qualify, such trusts must meet the following conditions:

> (i) The trust is established and managed by a nonprofit association.
>
> (ii) A separate account is maintained for each beneficiary of the trust, but, for purposes of investment and management of funds, the trust pools these accounts.
>
> (iii) Accounts in the trust are established solely for the benefit of individuals who are disabled . . . by the parent, grandparent, or legal guardian of such individuals, by such individuals, or by a court.
>
> (iv) To the extent that amounts remaining in the beneficiary's account upon the death of the beneficiary are not retained by the trust, the trust pays to the State from such remaining amounts in the account an amount equal to the total amount of medical assistance paid on behalf of the beneficiary under the State plan under this subchapter.

Id. No one disputes on this appeal that MPDT satisfies these conditions.

The Transfer Provision, section 1396p(c), also sets forth a broad general rule: If an applicant or that person's spouse "disposes of assets for less than fair market value on or after the look-back date," the applicant is ineligible for services, including long-term nursing care, for a period of time based on the value of the assets disposed. Id. § 1396p(c)(1)(A). For an institutionalized individual, the look-back date is a date up to sixty months before the first date as of which the individual is both institutionalized and has applied for benefits. Id. § 1396p(c)(1)(B)(i)-(ii). Essentially, this means that if a person disposes of assets for less than fair market value while receiving benefits or shortly before applying for benefits, the disposition will postpone eligibility. In short, you can't make yourself eligible for Medicaid faster by disposing of your assets unless you act before the look-back date. Here, there is no dispute that Richardson's transfer of assets occurred after the look-back date.

The Transfer Provision also contains a list of exceptions to its general rule governing the disposition of assets. Especially relevant here are the two exceptions provided by subsections 1396p(c)(2)(B)(iii) and (iv). First, subsection (iii) applies to assets transferred to trusts, including pooled special needs trusts, established for an applicant's disabled child.

Second, subsection (iv) applies to assets "transferred to a trust (including a trust described in subsection (d)(4) of this section) established solely for the benefit of an individual <u>under 65 years of age</u> who is disabled."  <u>Id.</u> § 1396p(c)(2)(B)(iv) (emphasis added).  While we assume that MPDT is a trust "described in subsection (d)(4)," and that Richardson's MPDT account was established for her own benefit, she was not younger than sixty-five when her conservator deposited the funds in the trust.

## III.

We consider first the breadth of the general rule set forth by the Transfer Provision:  That general rule applies, as relevant here, when a putative beneficiary "disposes of assets for less than fair market value."  <u>Id.</u> § 1396p(c)(1)(A).  The statute does not define "dispose," so we assume the word carries its ordinary meaning.  Merriam Webster defines "dispose," in relevant part, as "to transfer to the control of another."  <u>Merriam Webster's Collegiate Dictionary</u> (10th ed. 1993).  The Sixth Edition of Black's Law Dictionary defines "dispose of" as "to alienate or direct the ownership of property . . . to pass into the control of someone else; to alienate, relinquish, or get rid of."  Dispose of, <u>Black's Law Dictionary</u> (6th ed. 1990).  The statute's text equates "dispose" with "transfer."  Likewise, the Ninth Edition of Black's defines "transfer" as "[a]ny mode of disposing of or parting with an asset or interest in an asset."  Transfer, <u>Black's</u>

Law Dictionary (9th ed. 2009). Trust law, in turn, regards a transfer or conveyance of property as necessary to create a valid trust. 76 Am. Jur. 2d Trusts § 47 (2018).

In short, all principal resources strongly indicate that when a person places her property into a trust (and most certainly an irrevocable trust), thereby surrendering control of the property to the trustee, she has disposed of the property. In the absence of some reasonably specific instruction to the contrary, it follows that the Transfer Provision's general rule covers the conveyance of property to a trust, including a pooled special needs trust like MPDT. That the Transfer Provision includes exceptions for transfers to pooled special needs trusts in two circumstances reinforces this conclusion. See 42 U.S.C. § 1396p(c)(2)(B)(iii)-(iv). The presence of specifically enumerated exceptions also indicates that Congress likely intended to make no other exceptions apart from those specified. See Sony BMG Music Entertainment v. Tenenbuam, 660 F.3d 487, 499 (1st Cir. 2011) (citing Tenn. Valley Auth. v. Hill, 437 U.S 152, 188 (1978)).

MPDT characterizes the foregoing textual analysis as unduly myopic. MPDT correctly observes that we must rest our analysis on the statute as a whole, giving due weight to the context in which the text at issue appears. When we do this, MPDT contends, we should conclude that the Transfer and Trust Provisions are "cognate subsections" with their "own area[s] of operation"

that do not overlap except as "explicitly specified." Under this view, the Trust Provision "broadly and comprehensively regulates the impact on Medicaid eligibility of trusts created or funded by the individuals seeking Medicaid benefits." And since nothing in the Trust Provision states that a transfer of assets into a pooled special needs trust will affect eligibility, MPDT reasons, that is the end of the matter.

To underpin this view of how the two provisions interact, MPDT and its supporting amici point to the treatment of irrevocable trusts in subsection 1396p(d)(3)(B). Subsection 1396p(d)(3)(B)(i) specifies that the portion of the trust corpus from which payments could be made to the individual will be deemed available to the individual, and payments from an irrevocable trust for any purpose other than to or for the benefit of the individual "shall be considered a transfer of assets by the individual subject to [the Transfer Provision]." Subsection 1396p(d)(3)(B)(ii) further provides that any portion of an irrevocable trust from which no payment could be made to the individual "shall be considered, as of the date of establishment of the trust . . . to be assets disposed of by the individual for purposes of [the Transfer Provision]." MPDT and amici argue that these commands to treat certain parts of the corpus of or payments from an irrevocable trust as subject to the transfer penalty give rise to a negative

inference that establishing an irrevocable trust not penalized under these subsections incurs no transfer penalty.

It appears that the Centers for Medicare and Medicaid Services ("CMS"), the arm of the Department of Health and Human Services ("HHS") that interprets the Medicaid statute, might have shared the view that the specific commands of the Trust Provision can take priority over the more general commands of the Transfer Provision. We say "might" because CMS seemed to invoke this view only when necessary to avoid a potential double penalty (e.g., penalizing the same transfer of assets twice). State Medicaid Manual, Health Care Financing Administration Pub. 45-3, Transmittal 64, § 3259.6(G) (Nov. 1994) ("To avoid such a double penalty, application of one provision must take precedence over application of the other provision." (emphasis added)) [hereinafter "Transmittal 64"]. In any event, even assuming this view to be correct, MPDT and amici run into trouble in the very next subsection. Subsection 1396p(d)(4) states that the entire Trust Provision (including those portions of subsection 1396p(d)(3) upon which MPDT relies to draw a negative inference precluding application of the Transfer Provision in some instances) does not apply to pooled special needs trusts. As the Second Circuit has observed, "[S]ubparagraph (d)(4) exempts qualifying trusts from the rules in (d)(3) but is silent about the

nature or scope of the rules the agency should apply in their stead."  Sai Kwan Wong v. Doar, 571 F.3d 247, 260 (2d Cir. 2009).

MPDT would nevertheless have us conclude that the exemption of pooled special needs trusts from the commands of the Trust Provision leaves such trusts, for present purposes, exempt as well from the Transfer Provision's general rule.  But, like the Second Circuit, we are "not inclined to infer from statutory silence a congressional intent to have no rules whatsoever apply to income placed in qualifying (d)(4) trusts."  Id.  Furthermore, as we have already explained, the Transfer Provision broadly applies to any disposition of assets to a trust (at least when not overridden by the specific treatment of the Trust Provision). Moreover, were MPDT correct that a transfer of assets to a pooled special needs trust is not a disposition subject to the Transfer Provision, that Provision's express exceptions for certain such trusts in subsections 1396p(c)(2)(B)(iii) and (iv) would be entirely irrelevant.  Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 23 (1st Cir. 2018) ("[C]ourts should try to avoid interpretations that render statutory language mere surplusage.").

In an effort to parry the notion that its reading renders subsections 1396p(c)(2)(B)(iii) and (iv) superfluous, MPDT argues that the Transfer Provision only applies to transfers of assets to third-party trusts -- not to so-called "self-settled" trusts created for the benefit of the individual who created them.  MPDT

contends that the four exceptions to the general transfer rule laid out in subsections 1396p(c)(2)(B)(i) through (iv) all involve trust transactions for the benefit of someone other than the applicant. Those subsections exempt assets transferred: (i) to the individual's spouse or to another for the benefit of the spouse, (ii) from the individual's spouse to another for the benefit of the spouse, (iii) to the individual's child or to a trust for the individual's child, and (iv) to a trust, including a trust of the kind described in 42 U.S.C. § 1396p(d)(4), established for the benefit of a disabled individual under age sixty-five. If the exemptions only deal with transfers to or for the benefit of third parties, the argument goes, the relative comprehensiveness of the Trust Provision becomes more apparent -- and we may overlook the Transfer Provision's apparently clear application to the transfer at issue here.

This argument requires a more creative reading of the text of subsection 1396p(c)(2)(B)(iv) than we are willing to undertake. MPDT would have us hold that "for the benefit of an individual under 65 years of age who is disabled" means for the benefit of such an individual other than the applicant. But, as the Eighth Circuit explained in rejecting this same contention, "the plain language of this paragraph does not address, let alone restrict, the creator of the trust." Ctr. for Special Needs Tr. Admin. v. Olson, 676 F.3d 688, 702 (8th Cir. 2012). If Congress

- 16 -

intended subsection 1396p(c)(2)(B)(iv) to apply only to trusts benefiting disabled individuals other than the applicant, we would expect a clearer indication of that intent than the use of the article "an" rather than "the" before the word "individual." As the subsection stands, the phrase "an individual" includes the applicant herself. Moreover, "[b]y referencing 'subsection (d)(4),' paragraph 1396p(c)(2)(b)(iv) necessarily includes trusts created by the beneficiary, because subsection (d)(4)(C) includes trusts created by the beneficiary." Id. Finally, even if we were to read the Transfer Provision's exceptions as limited to trusts established for other persons, we would have simply limited the scope of the exceptions without limiting the scope of that Provision's general rule.

MPDT also puts forward a redundancy argument. To advance this claim, MPDT points again to subsection 1396p(d)(3)(B)(ii) of the Trust Provision. MPDT reasons that this subsection would be unnecessary if the Transfer Provision already, by its own force, classified the transfer of assets to a trust, unless excepted, as grounds for an eligibility penalty. But this claimed redundancy says nothing about the impact of the Transfer Provision on exempt trusts, like MPDT, as subsection 1396p(d)(3)(B)(ii) does not apply to funds placed in these trusts. See 42 U.S.C. § 1396p(d)(4). Moreover, as we have already explained, MPDT's alternative reading would itself treat as surplusage subsections 1396p(c)(2)(B)(iii)

and (iv), which expressly exempt from the Transfer Provision certain transfers into pooled special needs trusts, but not others. Given a choice between two potential redundancies, we are inclined to opt for the one that does not require us to ignore the most natural reading of the text of the Transfer Provision's general rule.

Properly returning its focus to that general rule, MPDT and amici also claim that no transfer or disposal of assets occurred at all in this case because the funds were "given to the trustee of a self-settled trust." Citing subsection 1396p(d)(3)(B)(i), MPDT maintains that such assets remain "available" to beneficiaries, albeit not in the case of pooled special needs trusts. MPDT cites no authority for its assertion that assets transferred to self-settled pooled special needs trusts "still belong to the applicant," such that "they have not been transferred." Rather, as MDHHS avers, the conveyance at issue here constituted an "irrevocable transfer" of legal title to a trustee with "sole and uncontrolled discretion" to make distributions for the benefit of the beneficiary. As we have already explained, the customary meaning of the statutory word "disposes" in the general transfer rule fairly encompasses such a conveyance. Indeed, MPDT points to no definition of the term that would not encompass such a conveyance. We therefore cannot agree with MPDT that the entire Transfer Provision is inapplicable when

a putative beneficiary transfers her assets to a self-settled pooled special needs trust.

Taking an alternative track, MPDT seems to suggest that our reading of the statute actually leaves CMS no room to allow the Trust Provision's specific mandates to, in some situations, override the Transfer Provision's general rule. And because, without this latitude, reasons MPDT, double penalties (for ineligibility and availability or for two transfers) would necessarily occur, our reading must be incorrect. But, as we noted earlier, Transmittal 64 seems to state that the Trust Provision should be "given precedence" when a transfer of assets into a nonexempt trust would be otherwise penalized twice. Transmittal 64, § 3259.6(G). MPDT never explains why CMS would not still have this leeway under our reading or even how frequently (and unavoidably) such double penalties might occur. Furthermore, as we have already observed, the entirety of the Trust Provision does not apply to pooled special needs trusts. So, any carve-out from the transfer rules that the Trust Provision might create would have no application to the trust at issue in this case.

In light of the complexity of the foregoing discussion, we summarize our reading of the statute: Subsection 1396p(c)(1)(A) of the Transfer Provision plainly and broadly treats as an eligibility-delaying transfer any disposition of beneficiary assets to a trust for less than fair market value;

subsection 1396p(c)(2)(B)(iv) of the Transfer Provision creates an exception from that general rule for certain transfers to pooled special needs trusts established for the benefit of the beneficiary, but only when the beneficiary is under sixty-five years of age; and subsection 1396p(d)(3)(B) of the Trust Provision may also implicitly except from that general rule certain transfers to irrevocable trusts, but that subsection does not apply to pooled special needs trusts, which are exempted from the whole of the Trust Provision under subsection 1396p(d)(4)(C). So, when a beneficiary who is age sixty-five or older gives up her assets for less than fair market value to a pooled special needs trust, there has been a transfer that triggers a temporary period of ineligibility.

Our reading is consistent with the holdings and dicta of other courts that have considered the issue. See Olson, 676 F.3d at 702 ("By the omission of an age limit in the 'C' paragraph of subsection (d), Congress's intent was to permit disabled persons over age 65 to participate in 'C' pooled trusts."); Cox v. Iowa Dep't of Human Servs., 920 N.W.2d 545, 553 (Iowa 2018) (distinguishing "between an individual's participation in a pooled special needs trust and the individual's temporary disqualification from Medicaid long-term care benefits based on that participation"); In re Pooled Advocate Trust, 813 N.W.2d 130, 142 (S.D. 2012) (noting that the Medicaid statute

"differentiate[s] between participation in a pooled trust and subsequent penalty periods and delays in eligibility for transfers to the trust" (citing Olson, 676 F.3d at 702)).

So too, agency interpretations of the Trust and Transfer Provisions bolster our understanding of the statutory language. The U.S. Supreme Court has recognized that "even relatively informal" CMS guidance "'warrant[s] respectful consideration' due to the complexity of the [Medicaid] statute and the considerable expertise of the administering agency."  Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 138 (2d Cir. 2002) (quoting Wis. Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 497 (2002)). Here, the district court, the parties, and amici focus on three separate agency interpretations of the relevant provisions:  State Agency Regional Bulletin No. 2008-05 (the "Bulletin"), sections 3257 through 3259 of the State Medicaid Manual ("Transmittal 64"),[2] and the Social Security Administration's Program Operations Manual ("SSA Manual").

As we have already explained, Transmittal 64 can indeed be read as stating that the specific commands of the Trust Provision take precedence over the Transfer Provision's general rule, at least when necessary to avoid a potential double penalty.

---

[2] Updates to the State Medicaid Manual are known as "transmittals." CMS issued Transmittal 64 shortly after OBRA was passed in 1993.

But Transmittal 64 also makes clear that, while certain trusts are exempt from both the Trust and Transfer Provisions, "a special needs trust established for a disabled individual who is age 66 could be subject to a transfer penalty." Transmittal 64 § 3259.7(B). MDHHS also correctly notes that there is no prospect of a double penalty in this case. That is, while a transfer of assets to a pooled special needs trust may be subject to a penalty period under the transfer rule, funds in pooled special needs trusts are not considered available -- and therefore are not "penalized" for eligibility purposes -- under the Trust Provision. So, although Transmittal 64 states that "the trust provisions are given precedence in dealing with assets placed in trusts" to avoid such a double penalty, this guidance is irrelevant here because assets placed in pooled special needs trusts are never subject to a double penalty. Id. § 3259.6(G).

The CMS Boston Regional Office's 2008 Bulletin explicitly supports our reading of the Medicaid statute, stating, in no uncertain terms: "A pooled trust established by an individual age 65 or older is not exempt from the transfer of assets provisions." Ctrs. for Medicare & Medicaid Servs., State Agency Reg'l Bull. No. 2008-05, Medicaid Eligibility -- Application of Transfer of Assets Penalty for Pooled Trust (2008). It further provides:

> Although a pooled trust may be established for beneficiaries of any age, funds placed in a pooled trust established for an individual age 65 or older may be subject to penalty as a transfer of assets for less than fair market value. When a person places funds in a trust, the person gives up ownership of those funds. Since the individual generally does not receive anything of comparable value in return, placing funds in a trust is usually a transfer for less than fair market value. The statute does provide an exception to imposing a transfer penalty for funds that are placed in a trust established for a disabled individual. However, only trusts established for a disabled individual age 64 or younger are exempt from application of the transfer of assets penalty provisions . . . .

Id.

The Social Security Administration reaches the same conclusion in its Program Operations Manual, "the publicly available operating instructions for processing Social Security Claims." In re Pooled Advocate Trust, 813 N.W.2d at 145 (quoting Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 385 (2003)). The SSA Manual acknowledges that, while "[t]here is no age restriction under [the Trust Provision's] exception," it also states that "a transfer of resources to a trust for an individual age 65 or over may result in a transfer penalty." Soc. Sec. Admin., Program Operations Manual System, Exceptions to Counting Trusts Established on or after 1/1/00, SI 01120.203(B)(2)(a); see also Social Sec. Admin, Program Operations Manual System, Exceptions - Transfers to a

- 23 -

Trust, SI 01150.121(A)(3) ("The period of ineligibility does not apply to an individual who transfers a resource to a trust established for the sole benefit of an individual including himself or herself who is under age 65 and is blind or disabled.").

Amici argue that the Bulletin's interpretation must be legally incorrect because it would "nullif[y]" the exemption of pooled special needs trusts from section 1396p(d). But, as MDHHS counters, "application of the Transfer Provision to the funding of pooled special needs trusts does not prevent the Trust Provision from conferring real and tangible benefits." Rather, assets in pooled special needs trusts are never counted as available resources or income under the Trust Provision, and transfers into such trusts by applicants before they reach the age of sixty-five are not subject to a penalty period at all. See In re Pooled Advocate Trust, 813 N.W.2d at 143 (noting the need to "differentiate between being denied Medicaid long-term care assistance and being subject to a delay in eligibility for Medicaid long-term care assistance via a penalty period" and explaining that "[t]he applicant may . . . qualify for medical-only coverage during the penalty period[,] . . . and after the penalty period expires, the applicant may thereafter be eligible for long-term care assistance."). Although the impact of a penalty period on eligibility for long-term care benefits is certainly not

negligible, neither are the potential benefits that remain from participation in timely-created pooled special needs trusts.

It is true that CMS recognized in Transmittal 64 that applying the Transfer Provision to so-called Miller trusts would render them ineffective, so CMS allows certain Miller trusts to avoid a transfer penalty. See Transmittal 64 § 3259.7(B)(2). MPDT contends that such an allowance conflicts with CMS's view that the Transfer Provision applies to some exempt (d)(4) trusts, like MPDT, signaling that this interpretation must be incorrect. But Transmittal 64 provides only that a transfer penalty is not triggered when "resources placed in [a] trust are used to benefit the individual, and the trust purchases items or services for the individual at a fair market value." Id. Of course, if the disposition of assets is indeed for fair market value, the Transfer Provision -- by its plain terms -- does not apply.[3]

To the extent that MPDT further asserts that the plain-text interpretation of the Trust and Transfer Provisions runs against the congressional purpose motivating their enactment, it discounts Congress's clear intent to ensure that individuals "exhaust their own resources before turning to the public for assistance." Lewis, 685 F.3d at 332-33; see also Sai Kwan Wong,

_____

[3] As noted above, and as Judge Barron's concurring opinion explains in detail, MPDT does not argue on this appeal that Richardson received fair market value in the form of the expenditures MPDT would make on her behalf.

- 25 -

571 F.3d at 261 (noting "Congress's general instruction that individuals must contribute their available income to the cost of their institutional care"). As the United States asserts, "Congress sought to ensure that state resources would be available for the low-income individuals who are most in need."

## IV.

In the end, we need not and do not decide that MPDT's interpretation of the statute lacks reason. Rather, we hold that the district court's judgment granting MDHHS's motion to dismiss rests on a more reasonable interpretation of the statute. That judgment is therefore <u>affirmed</u>.

**- Concurring Opinion Follows -**

BARRON, **Circuit Judge, concurring**. I join in full our opinion affirming the District Court's dismissal of Maine Pooled Disability Trust's ("MPDT") claim that "no statute imposes a transfer of assets penalty for transfers to an exempt pooled special needs trust such as the MPDT." I think it important to emphasize, though, one point that our opinion notes: MPDT failed to make any developed argument to us that the Maine Department of Health and Human Services ("MDHHS") violated its statutory right to operate a pooled special needs trust pursuant to 42 U.S.C. § 1396p(d)(4)(C) by not recognizing the settlement of such a trust as a transfer of assets for "fair market value." 42 U.S.C. § 1396p(c)(1)(A).

In consequence of that failure, we have no occasion to address that distinct legal contention. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). But, in future cases, settlors of pooled special needs trusts, and perhaps the trusts themselves, may well seek to argue in support of their § 1983 suits against states seeking to impose the transfer penalty that no such penalty may be imposed, because the settlor receives "fair market value" for the funds used to create the trust from the expenditures that the trust makes for the settlor's benefit. And, in the event that argument is pressed in such future cases,[4] they may well bring

---

[4] For reasons not relevant here, the District Court determined below that it had no jurisdiction to hear the settlor's § 1983

to the fore an issue that we bypass here, but that may bear on how these technical statutory provisions should be construed: whether the Centers for Medicare & Medicaid Services ("CMS") is of the view that the settlement of a pooled special needs trust may constitute a transfer of assets for "fair market value" within the meaning of 42 U.S.C. § 1396p(c)(1)(A)?

I thus write separately to explain why that issue may matter, in hopes of clearing away some possible confusion down the line. For, whether CMS considers the settlor of a pooled special needs trust to have received "fair market value" from the expenditures that the trust makes on the settlor's behalf may very

---

claim. See Richardson ex rel. Carlin v. Hamilton, No. 2:17-CV-00134-JAW, 2018 WL 1077275, at *5 (D. Me. Feb. 27, 2018). The District Court also concluded that the trust itself -- MPDT -- was not positioned to argue, under § 1983, that it had an enforceable right that had been violated by MDHHS, insofar as MPDT sought to premise that enforceable right on 42 U.S.C. § 1396p(c) (the "Transfer Provision"). See id. at *12-13. MPDT does not challenge that ruling and thus makes no contention that, even if the transfer rule does apply, no transfer penalty may be imposed because its "fair market value" condition has been met. See 42 U.S.C. § 1396p(c)(1)(A). There is precedent to suggest, however, that settlors of such trusts -- and perhaps the trusts themselves -- may sue states under § 1983 for subjecting deposits into such trusts to the transfer penalty in circumstances where, although the rule applies, the terms of the rule have been complied with such that no penalty should be imposed. See, e.g., Dultz v. Velez, 726 F. Supp. 2d 480, 490 (D.N.J. 2010) ("conclu[ding] that § 1396p(c)(1) creates an individually enforceable right"); Aplin v. McCrossen, No. 12-CV-6312FPG, 2014 WL 4245985, at *20 (W.D.N.Y. Aug. 26, 2014) ("[C]ompliance with the federal transfer of assets statute is mandatory on the States and is enforceable under 42 U.S.C. § 1983."); cf. Johnson v. Guhl, 91 F. Supp. 2d 754, 770 (D.N.J. 2000) (holding that "§ 1396p(c)(2)(D) provides for a cause of action under § 1983").

- 28 -

well affect the persuasiveness of a contention by a future settlor of such a trust -- or by the trust itself -- that no transfer penalty should be imposed. After all, this body of law is quite technical, and the case for according deference to a persuasive interpretation of it by CMS would seem to me to be quite strong. See United States v. Mead Corp., 533 U.S. 218, 235 (2001) ("There is room . . . to raise a Skidmore claim . . . where the regulatory scheme is highly detailed, and [the agency] can bring the benefit of specialized experience to bear on the subtle questions in th[e] case." (citing Skidmore v. Swift & Co., 323 U.S. 134 (1944)).

## I.

CMS's state Medicaid eligibility manual, Transmittal 64, provides that no transfer penalty should be imposed on the settlement of an exempt trust if "resources placed in the trust are used to benefit the individual, and the trust purchases items and services for the individual at fair market value." State Medicaid Manual, Health Care Financing Administration Pub. 45-3, Transmittal 64, § 3259.7(B)(2) (Nov. 1994) [hereinafter "Transmittal 64"]. MPDT -- like MDHHS -- appears to be of the view that CMS created this "fair market value" workaround only for so-called Miller trusts, see 42 U.S.C. § 1396p(d)(4)(B), and not for pooled special needs trusts. I say that because MPDT advances an argument in service of its contention that the transfer rule

- 29 -

does not apply to exempt trusts that necessarily proceeds on that assumption.

But, contrary to MPDT's apparent view, the text of Transmittal 64 seems most naturally read to treat the rules concerning the "fair market value" workaround as applying to all exempt trusts, pooled special needs trusts among them. The subsection of Transmittal 64 that sets forth the eligibility rules for pooled special needs trusts states, in no uncertain terms, that "[r]esources placed in an exempt trust for a disabled individual are [not] subject to imposition of a [transfer] penalty . . . [if] the resources placed in the trust are used to benefit the individual, and the trust purchases items and services for the individual at fair market value." Transmittal 64 § 3259.7(B)(2) (emphasis added).

That subsection does direct us to "[s]ee subsection C" -- which is, in turn, titled "Miller-Type or Qualifying Income Trusts (QIT)" -- "for the rules concerning application of the transfer of assets provisions to assets placed in an exempt trust." Id. (emphasis added). But, the subsection goes on to state that "[t]hese rules apply to . . . resources placed in the exempt trusts discussed in this section," which include pooled special needs trusts. Id. (emphasis added).

Some states -- including Maine -- appear to share MPDT's view that CMS does not treat the deposit of funds into a pooled

special needs trust as a transfer for fair market value, even if the trust makes purchases on the settlor's behalf. The states appear to base that understanding on a subsequent bulletin that CMS issued in 2008 on the treatment of pooled special needs trusts (the "2008 Bulletin"), which does not mention this "fair market value" workaround for that type of trust. See Ctrs. for Medicare & Medicaid Servs., State Agency Reg'l Bull. No. 2008-05, Medicaid Eligibility -- Application of Transfer of Assets Penalty for Pooled Trust (May 12, 2008).

But, while the 2008 Bulletin does instruct state agencies that, pursuant to 42 U.S.C. § 1396p(c)(2)(B)(iv), "only [pooled] trusts established for a disabled individual age 64 or younger are exempt from application of the transfer of assets penalty provisions," 2008 Bulletin at 1 (emphasis added), that statement is not necessarily at odds with the view that I glean from Transmittal 64. Even if the Transfer Provision does apply to pooled special needs trusts, a transfer penalty may only be imposed under that provision where the settlor "disposes of assets for less than fair market value." 42 U.S.C. § 1396p(c)(1)(A) (emphasis added).[5] Thus, the fact that the 2008 Bulletin states that "funds

_____

[5] The 2008 Bulletin does state that "[w]hen a person places funds in a trust, the person gives up ownership of those funds. Since the individual generally does not receive anything of comparable value in return, placing funds in a trust is usually a transfer for less than fair market value." 2008 Bulletin at 1 (emphasis added). But, read in context, that appears to be a

- 31 -

placed in a pooled trust established for an individual age 65 or older _may_ be subject to penalty as a transfer of assets for less than fair market value" actually suggests -- contrary to the views of some states -- that CMS may still recognize, as it appeared to in Transmittal 64, that such a disposal of assets may escape a transfer penalty if it is for "fair market value."  2008 Bulletin at 1 (emphasis added).

Notably, the United States's amicus brief on behalf of CMS is silent on this very point.  That fact only serves to underscore for me the possibility that CMS is still of the view that it seemingly espoused in Transmittal 64:  that the settlor of a pooled special needs trust can be deemed to receive fair market value for settling the trust from the purchases that the trust can make on her behalf.  Consistent with that suspicion, the United States's amicus brief even emphasizes that "for purposes of this appeal, it is undisputed that [the settlor] did not receive fair market value in disposing of [her] assets [to MPDT]."

## II.

Insofar as CMS does hold such a view, there remains the question of how the "fair market value" workaround would work. Transmittal 64 provides that "an individual is considered to have received fair market value for funds placed in a[n] [exempt] trust"

---

general statement about trusts, and not a statement specific to pooled special needs trusts.

from certain payments "out of the trust." Transmittal 64 § 3259.7(C)(3). The payments include those made "out of the trust for medical care provided to the individual," which "purchased care at fair market value" and "any other payments made from the trust which are for the benefit of the individual and which reflect fair payments for any items or services which were purchased." Id. The items or services purchased are, in turn, described as including trust fees, "food or clothing for the individual, or mortgage payments for the individual's home." Id.

Given that the workaround is based on purchases that the trust makes after funds have been placed in the trust, it runs into a potential statutory problem. The transfer rule imposes an eligibility penalty only if an applicant "disposes of assets for less than fair market value" within the look-back period. 42 U.S.C. § 1396p(c)(1)(A). The statute does not define "dispose[]" or "fair market value." But, as our opinion explains, and as Transmittal 64 itself reflects, the ordinary meaning of "dispose[]" encompasses a deposit of funds into a trust -- even an exempt trust -- because "[a]n individual placing an asset in a trust generally gives up ownership of the asset to the trust." Transmittal 64 § 3259.6(G).

Read in light of the entire statutory phrase, then, the relevant inquiry for determining whether a disposal of assets is "for less than fair market value" would seem to be whether "the

individual . . . receive[s] fair compensation in return" for the assets at the time of their disposal. Id. And, consistent with that understanding, Transmittal 64 itself defines "fair market value" as "an estimate of the value of an asset, if sold at the prevailing price at the time it was actually transferred." Id. § 3258.1(A)(1) (emphasis added).[6] Hence, the potential problem with the workaround: At the actual time of the transfer into the trust, the settlor usually receives nothing tangible -- at least, nothing that could be said to constitute "fair market value" -- immediately in return, even if the trust is set up in a manner that obligates the trust to make future purchases of services or goods (at fair market value) for the settlor's benefit.

Transmittal 64 appears to recognize the potential statutory problem that arises from the mismatch between the timing of the settlor's deposit and the trust's expenditures, and it thus appears to propose a solution to the seeming problem. It provides that "[a]n individual cannot be considered to have received fair market value for funds placed in a trust until payments for some item or service are actually made." Transmittal 64 § 3259.7(C)(3)

_____

[6] Consistent with Transmittal 64's definition, MDHHS's policy manual defines "fair market value" as "compensation received for the asset . . . in a tangible form with intrinsic value that is equivalent to or greater than the value of the transferred asset" and provides that "[f]air market value must be received by the individual and not delivered at a future date." Maine Dep't of Health and Human Services, 10-144 Chapter 332, MaineCare Eligibility Manual, § 1.5 (Apr. 17, 2019) (emphasis added).

(emphasis added).  "Thus," according to Transmittal 64, "funds cannot be allowed to accumulate indefinitely in a[n] [exempt] trust and still avoid transfer of assets penalties."  Id.

Transmittal 64 in this way seems to contemplate that a retroactive adjustment of the transfer penalty would need to be made after "payments [out of the trust] for some item or service are actually made."  Id.  Transmittal 64 says little about how such a retroactive adjustment could be made.  But, Transmittal 64 does note that the Transfer Provision separately provides that no transfer penalty should be imposed when "all assets transferred for less than fair market value have been returned to the individual."  See 42 U.S.C. § 1396p(c)(2)(C)(iii); Transmittal 64 § 3258.10(C)(3).  And, with respect to that separate statutory exception, Transmittal 64 explains that "[w]hen a penalty has been assessed and payment of services denied, a return of assets requires a retroactive adjustment, including erasure of the penalty, back to the beginning of the penalty period."  Transmittal 64 § 3258.10(C)(3).  Transmittal 64 further provides, in explaining how that retroactive adjustment may be made, that "[w]hen only part of an asset or its equivalent value is returned, a penalty period can be modified but not eliminated.  For example,

if only half the value of the asset is returned, the penalty period can be reduced by one-half."  Id.

## III.

There is a case to be made, then, that CMS is of the view that the Medicaid statute permits this retroactive "fair market value" workaround for pooled special needs trusts that I have just described.  And thus, a settlor of a pooled special needs trust, or such a trust itself, may be well positioned to assert in a future case both that no transfer penalty may be imposed on deposits into such a trust even if the transfer rule does -- as we now hold -- apply and that CMS itself holds that same view.

Having CMS as an ally in such a suit obviously could be quite helpful.  After all, the statute itself does not define "dispose[]" or "fair market value."  CMS's expertise in interpreting those key statutory terms in such a highly technical regulatory regime thus would seem to "warrant[] respectful consideration."  Wis. Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 497 (2002) (noting CMS's "significant expertise . . . in the context of a complex and highly technical regulatory program" (internal quotation marks and citations omitted)); see also Mead, 533 U.S. at 235.

We are not confronted here, however, with any such contention by MPDT.  It argues that no transfer penalty should have been imposed on the settlor only because it asserts that the

- 36 -

transfer rule itself does not apply.  I thus fully agree that the decision below must be affirmed, as we face only a case in which CMS contends that the transfer rule does apply and in which the pooled special needs trust at issue has made no argument that it has been established in such a way that its settlor should be deemed to comply with that rule's "fair market value" condition.